### STATE OF CONNECTICUT *v.* MARTYN D. BRUNO
(14851)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

---

Argued September 19, 1995—decision released March 26, 1996

*Daniel S. Fabricant,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue,* executive assistant state's attorney, with whom, on the brief, were *Frank S. Maco,* state's attorney, and *David Shepack,* assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Martyn D. Bruno, was convicted after a trial to a three judge court of one count of murder in violation of General Statutes §§ 53a-54a and 53a-8, and of three counts of tampering with physical evidence in violation of General Statutes §§ 53a-155 (a) (1) and 53a-8.[1] He received a total effec-

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-155 provides: "Tampering with or fabricating physical evidence: Class D felony. (a) A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pend-

tive sentence of sixty years imprisonment.[2] He now appeals directly to this court pursuant to General Statutes § 51-199 (b).[3]

The defendant raises several claims on appeal. He first claims that: (1) the trial court improperly concluded that he had failed to make a sufficient preliminary showing, under the relevant state law standard, to warrant its in camera inspection of certain confidential records of two state's witnesses; (2) alternatively, the trial court improperly prevented him from making the requisite preliminary showing; and (3) the trial court improperly failed to secure for the record certain of the privileged records to which he sought access. He next claims that there was insufficient evidence to support his murder conviction because: (1) there was insufficient evidence of his intent to kill the victim; and (2) the evidence failed to establish that he, and not the state's two key witnesses, killed the victim. Finally, he claims that the trial court improperly: (1) admitted certain testimony; (2) admitted certain physical evidence; and (3) limited his cross-examination of a state's witness. We affirm the judgment of conviction.

The court reasonably could have found the following facts. During the evening of July 17, 1991, David Rusinko

---

ing, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding.

"(b) Tampering with or fabricating physical evidence is a class D felony."

[2] The defendant was acquitted of one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48. He was sentenced to fifty-five years imprisonment on his murder conviction, a consecutive five year term on the first count of tampering with physical evidence, and two concurrent five year sentences on the other two counts of tampering with physical evidence.

[3] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony,

was killed while "partying" at an isolated cabin in New Hartford with the defendant, Brian Bingham and Cara Ignacak. At that time, Rusinko and the defendant were both in their mid thirties and had been friends for many years. Bingham, then sixteen years old, had been a frequent drinking companion of the defendant for several months. Bingham and the defendant often visited the property of an abandoned summer camp that abutted the defendant's home, which consisted of 175 acres of wooded property and a number of structures, including a garage-like structure known as the "lower camp," and a three room cabin with a porch known as the "upper camp." Bingham was also acquainted with Rusinko, who was a neighbor, and they occasionally socialized together. Ignacak, then eighteen or nineteen years old, had been Bingham's girlfriend of three and one-half weeks. She had known Bingham from high school for approximately two years before they started dating, had met the defendant several times during the few weeks she and Bingham had been dating, and had met Rusinko for the first time on the day that he was killed.

During the afternoon of July 17, 1991, Bingham sought out Rusinko in New Hartford to ask him to buy liquor and to meet him later that evening, which Rusinko agreed to do. At approximately 6 p.m., Bingham and Ignacak went to the defendant's home and the three went to the lower camp. While there, the defendant told them that he was angry at Rusinko for his role both in the defendant's most recent conviction for drunk driving[4] and in a problem with a drug deal, and that he wanted to kill Rusinko.

or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[4] Four months prior to the murder, in March, 1991, the defendant and Rusinko were stopped by Douglas Schlichting, a Granby police officer, while riding in a car driven by the defendant. According to Schlichting, Rusinko offered him a beer while he was speaking to the defendant, and the defendant

The defendant and Bingham left the lower camp at 7:30 p.m. on Bingham's motorcycle to buy liquor and to meet Rusinko and invite him to spend the evening with them. They met Rusinko on the road and he agreed to join them and continued on to the lower camp on his bicycle. The defendant and Bingham returned a few minutes later with beer and vodka, and the four remained there for a short time drinking and talking. According to Bingham, the defendant, while at the lower camp, asked him to step in and help if Rusinko started to get the best of him in a fight, and Bingham agreed to do so.

At approximately 8 p.m., the group moved to the cabin at the upper camp. Shortly after their arrival, while Rusinko was inside the cabin, the defendant joined Bingham and Ignacak on the porch and again told them that he intended to harm Rusinko. Shortly thereafter, the defendant began yelling at and shoving Rusinko, but stopped when Ignacak suffered a seizure of some sort. After Ignacak had recovered, the altercation between the defendant and Rusinko resumed, and Bingham stepped in and knocked Rusinko to the floor. The defendant and Bingham then proceeded to beat Rusinko into unconsciousness, first by punching and kicking him, and then by hitting him with pieces of metal pipe that had been lying about the cabin. The defendant next attempted to break Rusinko's neck and, when that failed, slashed his throat. When it appeared

subsequently failed sobriety tests and was arrested for driving while intoxicated. Schlichting also testified that the defendant had argued loudly with Rusinko while the two were in the back seat of his police car en route to the police station and that the defendant had blamed the incident on Rusinko for getting them lost in Granby. The defendant was convicted of the offense of driving while intoxicated and, as a result, he served time in jail and his operator's license was suspended effective June 8, 1991. The defendant testified that he did not recall Rusinko's offering the officer a drink, but that he had blamed Rusinko for getting the two lost in the area before they were stopped.

that Rusinko was dead, the defendant and Bingham rolled his body into the fire in the cabin's fireplace, along with the steel pipes used to beat him, glass beer bottles and the defendant's sneakers. At approximately 11:30 p.m., when Rusinko's body was "starting to bubble," Bingham and Ignacak left the cabin to bring Ignacak home. The defendant spent the night at the cabin.

The defendant and Bingham returned to the cabin one or two days later to dispose of Rusinko's remains and to conceal other evidence of the murder. They smashed Rusinko's bones in the fireplace, collected them into a plastic bag, and disposed of them in an outhouse at the camp. Police investigating the murder recovered a small amount of human skeletal remains from the outhouse, which were identified as Rusinko's. The defendant and Bingham also threw off the porch the steel pipes that had been burned in the fireplace, attempted to cover blood stains around the cabin with fresh paint, burned the porch railings and the plastic bag and, sometime later, disassembled and buried Rusinko's bicycle.

At trial, the defendant testified in his own defense. He claimed that during the day and evening of the murder he had consumed a great deal of alcohol and Valium and, as a result, had experienced a blackout that evening at the upper camp, which left him unable to remember Rusinko's murder. He admitted to concealing the evidence of the murder with Bingham. His theories of defense were: (1) that Bingham and Ignacak had killed Rusinko without his participation;[5] and (2) that, due to his consumption of alcohol and Valium preceding the murder, he had been unable to form the requisite specific intent to murder Rusinko. The trial court convicted

---

[5] In a separate proceeding prior to the defendant's trial, Bingham pleaded guilty to one count each of murder and conspiracy to commit murder and to three counts of tampering with physical evidence. He ultimately received a total effective sentence of thirty years imprisonment.

the defendant of all counts except conspiracy to commit murder, and denied his motions for acquittal[6] and for a new trial.[7] Additional facts will be discussed as they become relevant in the context of the defendant's specific claims.

## I

Prior to trial, the defendant moved for disclosure and an in camera examination of any psychiatric records of Ignacak and Bingham for the purpose of discovering material therein relevant to their abilities accurately to perceive, recall and relate events. To this end, he subpoenaed certain of their psychiatric and school records.[8] After the state completed its direct examination of each witness, the defendant renewed his motion and made an offer of proof in order to obtain an in camera inspection by the court of the records. The trial court concluded that the defendant had failed to provide a sufficient foundation to warrant further inquiry into the records of either witness and, therefore, denied his request for an in camera inspection. The trial court marked for identification and sealed for appellate review some, but not all, of the records sought by the defendant.[9]

---

[6] The defendant moved for acquittal on the ground that there was insufficient evidence of his specific intent to kill Rusinko.

[7] The defendant moved for a new trial on the grounds that: (1) the trial court had improperly concluded that he had failed to make a sufficient preliminary showing to justify an in camera review of Ignacak's and Bingham's confidential records; and (2) the trial court had improperly admitted into evidence several pieces of metal pipe.

[8] The defendant subpoenaed four sets of records pertaining to Ignacak: her Region Seven special education records; Winsted Memorial Hospital records; Charlotte Hungerford Hospital's outpatient psychiatric clinic records; and other Charlotte Hungerford Hospital medical records. The defendant also subpoenaed Bingham's Region Seven special education records and records pertaining to his treatment for alcohol and drug abuse in Mount Sinai Hospital's psychiatric unit program.

[9] The court marked for identification and sealed for possible appellate review all of the records subpoenaed by the defendant except the records from Mount Sinai Hospital pertaining to Bingham. The trial court returned

On appeal, the defendant claims that: (1) the trial court improperly concluded that he had failed to make a sufficient preliminary showing to justify its in camera review of Ignacak's and Bingham's records; (2) alternatively, the trial court improperly prevented him from making a sufficient showing under the proper standard; and (3) the trial court improperly failed to mark for identification and to seal for appellate review certain of Bingham's records. We are persuaded only by the defendant's third contention and conclude that the trial court's failure to preserve the records properly was harmless.

A

We turn first to the defendant's claim that the trial court improperly concluded that his offers of proof were insufficient, under Connecticut law, to warrant its in camera inspection of Ignacak's and Bingham's psychiatric and special education records. We are not persuaded by the defendant's claim.

It is well settled in this state that before a criminal defendant may obtain an in camera inspection of a witness' confidential records[10] for purposes of impeach-

---

the records to the hospital and marked for identification only the subpoena issued for those records.

[10] The defendant concedes that he was required to make a preliminary showing as to both the witnesses' psychiatric treatment and special education records. See *State* v. *D'Ambrosio*, 212 Conn. 50, 58, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990) (in camera inspection of psychiatric records requires preliminary showing pursuant to General Statutes § 52-146e); *State* v. *James*, 211 Conn. 555, 578, 560 A.2d 426 (1989) (preliminary showing of cause required before inspection of school records). Although in his brief the defendant stresses that school records enjoy less protection from disclosure than do psychiatric records, he clearly sought information as to Ignacak's psychiatric and psychological treatment history from her special education records, and he has not claimed that the two types of records should be treated differently for the purpose of determining whether his offers of proof were sufficient to justify breaching their confidentiality. Therefore, we assume, without deciding, that the same standard applies.

ment, he or she must first demonstrate that "there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken." *State* v. *Esposito*, 192 Conn. 166, 179, 471 A.2d 949 (1984); see also *State* v. *Kulmac*, 230 Conn. 43, 59, 644 A.2d 887 (1994) (department of children and youth services records); *State* v. *Joyner*, 225 Conn. 450, 477, 625 A.2d 791 (1993) (records of treatment for substance abuse); *State* v. *D'Ambrosio*, 212 Conn. 50, 58, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990) (psychiatric and substance abuse treatment records); *State* v. *James*, 211 Conn. 555, 578, 560 A.2d 426 (1989) (school records); *State* v. *Pierson*, 201 Conn. 211, 225, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) (psychiatric records); *In re Robert H.*, 199 Conn. 693, 708, 705 A.2d 475 (1986) (rape counseling records). Where, as here, the witness' records are sought for the purpose of obtaining evidence of a mental condition bearing on the witness' testimonial capacity, we require the defendant, who is afforded an opportunity to voir dire persons with knowledge of the contents of the records sought, to adduce a factual basis from which the trial court may conclude that there is a reasonable ground to believe that the records will reveal that " 'at any pertinent time' [the witness' mental problem] affected his testimonial capacity 'to a sufficient degree to warrant further inquiry.' " *State* v. *D'Ambrosio*, supra, 59;[11] see

---

[11] In *State* v. *D'Ambrosio*, supra, 212 Conn. 59, we stated that "in order to induce the trial court to inspect the records in camera, the defendant had to make a threshold showing that there was a *reasonable probability* that the records would reveal that 'at any pertinent time' [the witness'] alcohol problem affected his testimonial capacity 'to a sufficient degree to warrant further inquiry.' *State* v. *Pierson*, supra, [201 Conn. 225–26]; *State* v. *Esposito*, supra, [196 Conn. 180]." (Emphasis added.) The defendant claims that by using the term "reasonable probability" the court increased the

also *State* v. *Pierson*, supra, 226 (suggesting evidence of counseling for parent-child conflict would be inadequate to satisfy requirement for " 'threshold showing that at any pertinent time [the complainant] had a mental problem which affected [his] testimonial capacity in any respect' "); *State* v. *Esposito*, supra, 180 (trial court properly denied in camera inspection because defendant failed to make threshold showing "that at any pertinent time [the victim] had a mental problem which affected her testimonial capacity in any respect, let alone to a sufficient degree to warrant further inquiry").

The defendant called two witnesses in connection with his attempt to obtain an in camera inspection of Ignacak's records, Ignacak and S. Patricia Keener, the special education administrator at Ignacak's high school. Ignacak testified that she had been enrolled in a special education program during her senior year of

level of specificity or conclusiveness by which a criminal defendant must demonstrate the materiality of confidential records to which he seeks access than had previously been required under Connecticut law or is required under the threshold standard adopted for this purpose by the United States Supreme Court in *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) ("[The defendant], of course, may not require the trial court to search through the [record] without first establishing a basis for his claim that it contains material evidence. . . . 'He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense' [*United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982).]"); and, therefore, that its application to him violates his constitutional rights of confrontation, compulsory process and due process, under the sixth and fourteenth amendments to the federal constitution and article first, § 8, of the state constitution.

A careful reading of *D'Ambrosio* makes it clear, however, that the "reasonable probability" standard was simply a reformulation of our general standard governing a criminal defendant's access to confidential records and was not intended to increase the defendant's threshold burden. We are, therefore, unpersuaded by the defendant's constitutional argument. We do, however, acknowledge that the "reasonable probability" language, appearing for the first time in this context in *D'Ambrosio*, might be susceptible to misinterpretation, and for this reason, we will not continue its use.

high school because of her difficulty in learning academic subjects as rapidly as other students. In this context, she admitted to having trouble "recalling things," but expressly denied that this difficulty interfered generally with her ability to recall or relate the events of her life. As to her history of psychiatric treatment, she testified that she had been treated at the psychiatric department of Charlotte Hungerford Hospital in 1987 or 1988, and had met with Kathy Wurkus, the school psychologist or social worker,[12] "on and off" for some time thereafter. Ignacak indicated that her treatment at Charlotte Hungerford had lasted for approximately three weeks on an inpatient basis, followed by treatment for a few months as an outpatient, and that her diagnosis from the hospital was that she suffered from a "[m]ild case of depression," for which she did not receive medication once she was released from the hospital. She stated that her ongoing consultation with Wurkus was due to problems she had experienced in getting along with other people, namely that "[e]verybody just thought [she] was a prime target to beat up on." Ignacak also testified on cross-examination that she did not feel that her ability to recall events of her life was impaired, that she understood the obligation to be truthful and that she had never been told she was delusional, suffering from hallucinations or otherwise unaware of what was going on around her.

Keener confirmed that Ignacak had been enrolled in the department's academic classes, but stated that "she didn't really have any memory problems, or associative problems, or organizational problems. She had trouble sustaining a commitment to school, and she had trouble with the school rules. And she had interpersonal diffi-

---

[12] During the defendant's offer of proof, Ignacak referred to Wurkus as the school psychologist and Keener referred to Wurkus as the school social worker. The record does not clarify in which role Wurkus actually served, but, in any case, this confusion does not affect our decision.

culties." Keener also indicated that someone at the school had referred Ignacak to Wurkus for emotional support and had suggested that Ignacak participate in two on-site programs offered by Charlotte Hungerford Hospital and New Britain General Hospital, in conjunction with their respective psychiatric departments.

The defendant argues that Ignacak's admitted memory and interpersonal problems, which he claims may have reflected an "irrationality" or "irrational animosity" toward others, combined with her concession on direct examination that there were inconsistencies in the several statements she gave to police,[13] provided a sufficient factual basis to warrant an in camera review of her special education and psychiatric records.[14] We disagree.

In evaluating the sufficiency of the defendant's offer of proof, what is at issue is the existence of a mental problem that may bear on the witness' testimonial capacity, not the witness' general character or intelli-

---

[13] Ignacak admitted on direct examination that initially she had lied to the police about the murder in several respects.

[14] The defendant conceded at oral argument that he has never subpoenaed records pertaining to Ignacak's treatment in New Britain General Hospital's psychiatric program. He claims that he did not learn of Ignacak's psychiatric treatment at that hospital until Keener revealed it during his offer of proof and, therefore, that he lacked an opportunity to bring those records before the trial court. He seeks to have our review of the trial court's ruling on the sufficiency of his offer of proof include a determination as to whether he was entitled to an in camera inspection of those hospital records.

The relevant portions of the transcript indicate, however, that the trial court's ruling did not include the New Britain General Hospital records. The defendant argued at the close of his offer of proof only that there was "enough . . . before the court to permit the court to hold an in camera review of *the records which have been submitted.*" (Emphasis added.) He did not specifically seek a ruling as to the New Britain General Hospital records, which had not been submitted, and the trial court's statement of its ruling gives no indication that it was intended to include a determination as to those missing records. Therefore, our review of that ruling does not include a determination on the showing made as to the New Britain General Hospital records and his claim relating to records is not properly before us.

gence.[15] Here, the defendant failed to demonstrate a connection, other than purely speculative, between the facts he relies on and Ignacak's ability to perceive, recall and relate the events surrounding Rusinko's murder. First, neither Ignacak's nor Keener's testimony suggested the presence at any pertinent time of significant cognitive deficiencies; Keener's testimony expressly contradicted such a conclusion and indicated that Ignacak's special academic needs were due to problems motivational and, relatedly, behavioral in nature. Next, the defendant argues that Ignacak's "interpersonal problems" may have reflected "irrationality" on her part. We are not prepared to assume, however, that "irrationality," affecting one's ability to perceive, recall and relate events, is an ordinary incident of "interpersonal problems," particularly as Ignacak characterized hers, and the defendant fails to offer any reliable basis upon which to make that association or to contradict Ignacak's own assessment of the nature of these problems. The defendant also fails to demonstrate that the condition for which Ignacak was treated in the Charlotte Hungerford Hospital psychiatric program three to four years before the murder was related in any way to her testimonial reliability. As the state points out, the defendant did not offer any evidence as to whether depression could affect Ignacak's ability to perceive, recall and relate events, and did not offer any evidence to contradict Ignacak's testimony regarding the extent of her mental health problems. Lastly, the defendant fails to offer any explanation as to how Ignacak's admission that she had initially lied to police regarding the events of Rusinko's murder, although relevant to her

---

[15] In his brief to this court, the defendant argues that it was possible that Ignacak's records could also contain information relevant to bias. This claim, however, was not raised at trial and has been inadequately briefed on appeal. We therefore decline to review it. See Practice Book § 4065; *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 181 n.4, 629 A.2d 1116 (1993).

credibility for truthfulness, could reasonably be taken as evidence of a mental problem affecting her *ability* to relate those events truthfully. We conclude, therefore, that, on this record, the defendant failed to establish a sufficient foundation from which the trial court must necessarily have concluded that there was a reasonable ground to believe that the records would yield evidence useful to Ignacak's impeachment concerning lack of capacity to remember and relate events, and the trial court did not abuse its discretion when it denied his request for an in camera inspection of her records.

With regard to Bingham's records, the defendant called as witnesses Ian Bingham, Bingham's father, and Keener. Ian Bingham testified that his son had been living with him for approximately two years before the murder, during which time Bingham had run away to New York. He had been told that Bingham had used drugs involving needles while in New York and had observed track marks on his arms when he returned. Subsequently, he observed signs of Bingham's drinking, but had no knowledge of his taking any other drugs. After Bingham returned from New York, he entered a psychiatric treatment program at Mount Sinai Hospital. His father further testified that he was not sure what the purpose of the program had been, but believed that it had included treatment for substance abuse.

Keener testified that Bingham was involved in his high school's special education program from the fall of 1989, after his treatment in the Mount Sinai Hospital program, to some time in 1991, when he dropped out of school. She stated that Bingham was considered by the school to be a "social[ly] and emotional[ly] maladjusted and emotionally disturbed youngster," and that his emotional problems manifested themselves in his disregard of school rules, and his "terrible time dealing with authority figures," including rudeness, disrespect and extensive disruption of the classroom. She stated,

however, that he did not have problems with comprehension, that his responses to questions were appropriate, and that he did not have problems relating information.

The defendant argues that Bingham's emotional problems, substance abuse and having received psychiatric treatment provided a sufficient basis to warrant an in camera inspection of his special education and psychiatric records for evidence of a mental condition bearing on his testimonial capacity. We again disagree.

The defendant established only that Bingham was a youth with emotional and attitudinal problems that made the school experience difficult for him and for school officials who dealt with him, but did not, according to Keener, impair his testimonial abilities. With regard to his history of substance abuse and mental health treatment, the defendant established only that Bingham had been involved with drugs and had been treated in some type of substance abuse and psychiatric program approximately two years before the murder, and that he had continued to drink alcohol up until the time of the murder. However, "we have never held that a history of alcohol or drug abuse or treatment automatically makes a witness fair game for disclosure of psychiatric records to a criminal defendant"; *State v. Joyner*, supra, 225 Conn. 479; and the defendant fails to demonstrate how these facts might have affected Bingham's testimonial capacity in this case. We conclude, therefore, that, on this record, the defendant failed to establish a sufficient foundation from which the trial court must necessarily have concluded that there was a reasonable ground to believe that Bingham's records would yield evidence useful to his impeachment concerning lack of capacity to remember and relate events, and the trial court's denial of the defendant's request for an in camera inspection of Bingham's special

education and psychiatric records was not an abuse of its discretion.

## B

The defendant next claims, alternatively, that the trial court improperly precluded him from making the threshold showing required to warrant an in camera review of Ignacak's records in violation of his state and federal constitutional rights of confrontation.[16] Specifically, he claims that the trial court improperly prevented him from: (1) inquiring of Ignacak and Keener about the nature of Ignacak's "interpersonal difficulties"; (2) eliciting from Keener what diagnosis or reasons prompted the school to refer Ignacak to the New Britain General Hospital psychiatric program;[17] and (3) refreshing Keener's recollection with Ignacak's special education records. The defendant did not raise an objection to these rulings on this ground either at trial or in his motions for acquittal or for a new trial and, therefore, must seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[18] We conclude

[16] Although the defendant urges us to hold that infringement of his opportunity to make the requisite showing would violate not only his right of confrontation but also his rights of compulsory process and due process, he fails to suggest how our reaching those guarantees would make any difference to our analysis of his claims. We therefore decline to do so.

[17] It is not necessary for us to address this claimed error because, as we have stated; see footnote 14; the defendant failed to seek a ruling from the trial court as to whether he was entitled to an in camera inspection of Ignacak's records from New Britain General Hospital. His claim relating to those records, therefore, is not properly before us.

[18] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." This court "is free . . . to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." Id., 240.

that none of the trial court's rulings constituted constitutional error and, therefore, that the defendant's claims in this regard fail under the third prong of *Golding*.

The defendant first claims that the trial court's rulings prohibiting his inquiries into Ignacak's "interpersonal difficulties" were improper and precluded him from making the requisite showing with regard to her psychiatric and special education records. We disagree. During his offer of proof, the defendant asked both Ignacak and Keener to "explain" the nature of Ignacak's difficulties getting along with other people. The state objected on relevancy grounds and the trial court sustained these objections. The defendant argues that Ignacak's difficulty in getting along with other people was relevant because it could have been related to her problem recalling things and because it could have reflected an "irrational inability to get along with others." The state argues that the trial court's rulings were proper because the inquiries, as framed by the defendant, were not tied to Ignacak's testimonial abilities and, thus, were not relevant.

Although, as the defendant observes, "we have urged trial courts to permit the defendant a certain latitude in his attempt to make [the preliminary showing required to obtain an in camera inspection of confidential records]"; *State* v. *D'Ambrosio*, supra, 212 Conn. 60; he does not dispute that, in the context of his offer of proof to make that showing, our rules of evidence remain operative. The trial court retained the discretion to curtail inquiry that was not probative of Ignacak's ability accurately to perceive, recall and relate the events of Rusinko's murder. Cf. *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995); *State* v. *D'Ambrosio*, supra, 60. While we are mindful that the defendant's task to lay a foundation as to the likely relevance of records to which he is not privy is not an easy one, we are also mindful of the witness' legitimate interest

in maintaining, to the extent possible, the privacy of her confidential records. The decision whether the defendant's questions were appropriately tailored to discover relevant information was within the discretion of the trial court. See 1 C. McCormick, Evidence (4th Ed. 1992) c. 2, § 7, p. 23 (overbreadth and indefiniteness of inquiry are matters of relevancy).

Our assessment of the trial court's decision to restrict the defendant's access to the witness' confidential records must, however, take into account the recognized principle that such a restriction "implicates the defendant's constitutional right to impeach and discredit state witnesses." *State* v. *D'Ambrosio*, supra, 212 Conn. 61; see also *State* v. *Pierson*, supra, 201 Conn. 225; *State* v. *Storlazzi*, 191 Conn. 453, 457, 464 A.2d 829 (1983). The trial court's discretionary rulings, therefore, "even if . . . technically in accord with accepted rules of evidence"; *State* v. *Mastropetre*, 175 Conn. 512, 521, 400 A.2d 276 (1978); may impermissibly infringe upon the defendant's opportunity to establish the requisite showing. Thus, in reviewing the defendant's claim, we must also determine whether the trial court's rulings denied him a fair opportunity to elicit testimony "about how the records he sought might shed light on a relationship between [Ignacak's mental problems] and her capacity to testify truthfully." *State* v. *Joyner*, supra, 225 Conn. 479; cf. *State* v. *D'Ambrosio*, supra, 61 (trial court impermissibly infringed defendant's ability to make threshold showing); *State* v. *Ortiz*, 198 Conn. 220, 224, 502 A.2d 400 (1985) (trial court's traditional discretion over scope of cross-examination comes into play only after defendant accorded "some irreducible minimum of cross-examination into matters affecting the reliability and credibility of the state's witnesses"). We conclude that they did not.

The record reveals that the defendant's inquiries into the nature of Ignacak's interpersonal problems were all

general in nature and did not provide the trial court with a basis from which it could find that the records, to the extent they pertained to such problems, would relate to Ignacak's capacity accurately to perceive, recall and relate events. As such, the inquiries were not appropriately tailored to elicit information relevant to the issue for which the offer was made, and the trial court did not abuse its discretion in curtailing them. Further, the challenged rulings did not impermissibly restrict the defendant's opportunity to elicit, by appropriate inquiry, "testimony about how the records he sought might shed light on a relationship between [Ignacak's interpersonal problems] and her capacity to testify truthfully." *State* v. *Joyner*, supra, 225 Conn. 479. We have observed that "a defendant's right [of cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made." (Citation omitted.) *State* v. *Mastropetre*, supra, 175 Conn. 522. Similarly, in the present case, that the defendant was unable to explore fully Ignacak's interpersonal difficulties does not necessarily mean that the trial court's rulings impaired his constitutionally protected opportunity to make the requisite preliminary showing. The transcript does not indicate, and the defendant does not suggest, that the trial court would have rejected a properly focused inquiry into Ignacak's interpersonal problems.

The defendant's next claim is that the trial court improperly denied him permission to refresh Keener's memory as to certain details of Ignacak's history of psychiatric treatment, and thereby prevented him from carrying his threshold burden. We disagree.

During the defendant's examination of Keener, he posed several questions that she was unable to answer because she had not reviewed Ignacak's special education file before coming to court. After a number of such

instances, the defendant attempted to provide Keener with Ignacak's special education records, which Keener had brought in response to the defendant's subpoena, from which to refresh her recollection. The state objected to the defendant's doing so, on the ground that the defendant could not be permitted to go through the records himself. The trial court refused the defendant permission to refresh Keener's memory, reasoning that because the special education records were privileged and the defendant's access to them was itself at issue, neither he nor Keener could be permitted access to them in order to provide testimony regarding their contents.

The defendant argues that because Keener had custody of Ignacak's special education records and presumably could have reviewed them prior to giving testimony, and clearly needed to review them to answer some of his questions about Ignacak, the trial court abused its discretion by denying him permission to refresh Keener's recollection once she had taken the stand, and thereby impermissibly infringed his ability to make the requisite showing. The state argues that the trial court properly denied the defendant permission to refresh Keener's memory because the defendant failed to ask Keener what specifically in the records might have pertained to Ignacak's testimonial capacity and because the defendant failed to show affirmatively that Keener was authorized to access the records. We agree with the state that, on this record, the trial court's ruling did not constitute an abuse of its discretion and did not impermissibly infringe the defendant's opportunity to make the requisite showing.

"Whether the recollection of a witness needs to be refreshed and whether it can be or has been refreshed by any means is in each case a question for the trial court, and its conclusion is unreviewable unless there has been a clear abuse of discretion." *State* v. *Grimes,*

154 Conn. 314, 322, 228 A.2d 141 (1966). The procedure for refreshing the recollection of a witness who has taken the stand ordinarily entails "counsel['s] . . . hand[ing] her a memorandum to inspect for the purpose of 'refreshing her recollection,' with the result that when she speaks from memory thus revived, her testimony is what she says, not the writing." 1 C. McCormick, supra, c. 2, § 9, p. 29. A safeguard to this procedure "is the rule which entitles the adverse party, when the witness seeks to resort to the memorandum, to inspect the memorandum so that she may object to its use if ground appears, and to have the memorandum available for her reference in cross-examina[tion] . . . . With the memorandum before her, the cross-examiner has a good opportunity to test the credibility of the witness's claim that her memory has been revived, and to search out any discrepancies between the writing and the testimony." Id., p. 32; see also *State* v. *Watson*, 165 Conn. 577, 593, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d (1974) (adverse party has right to examine document used by witness to refresh memory while testifying).

It is beyond serious debate that the trial court properly prevented the defendant from refreshing Keener's memory in the ordinary manner; to allow him to do so would have entailed his inspection of the records at issue in order to retrieve the specific documents that would jog Keener's memory, and would have required disclosure of any such documents to the prosecution. To permit this would have defeated entirely the protective procedure we have adopted to accommodate the witness' privacy.

The question whether an alternative procedure by which Keener alone could have reviewed the records should have been permitted requires additional discussion. Although ideally a witness called to provide testimony regarding confidential records should be

thoroughly familiar with their contents, this will not always be the case. If such a witness is unable to respond to relevant inquiry, the trial court should determine, in its discretion, whether an alternative procedure, such as permitting the witness access to a particular document while testifying, without disclosure to either defense counsel or the prosecution, or permitting the witness to leave the stand to familiarize herself with the records and return to the stand at a later time, is warranted, permissible and feasible.[19]

In determining whether such an alternative procedure is warranted, the trial court should consider, among other relevant factors, the nature of the information sought to be provided by refreshing the witness' recollection and whether the witness whose memory the defendant seeks to refresh is the only person who feasibly could provide the information sought. On this record, because the defendant did not clearly articulate a request for an alternative procedure, did not establish Keener's authority to review the records, did not seek to recall Ignacak or to call counselors who might have been able to answer the inquiries Keener was unable to satisfy, and does not claim that he was prevented from doing so, we find no abuse of discretion in the trial court's denial of permission to refresh Keener's memory.

Further, we conclude that the trial court's ruling did not impermissibly restrict the defendant's opportunity

---

[19] To the extent that the trial court reasoned that, because the records were privileged, Keener herself could not review them once on the stand to provide testimony, we disagree. If Keener was authorized to examine the records, and thus could have reviewed them prior to taking the witness stand, her reviewing the records later rather than earlier would not have infringed upon Ignacak's privilege. Only the defendant's attempt, through his examination of Keener, to elicit from her information contained in the records implicated Ignacak's privilege, and the trial court possessed the discretion to control the scope of the defendant's inquiry on a question-by-question basis.

to make the required showing. As we noted previously, a criminal defendant's opportunity to gain access to a witness' confidential records is not unconstitutionally impaired whenever the defendant does not successfully pursue a relevant line of inquiry. Here, although the trial court's ruling might have prevented the defendant from gaining access by one method to the information he sought, it did not cut off all reasonably available avenues to that information.

## C

The defendant's last claim in this regard is that the trial court's failure to mark for identification and seal for appellate review Bingham's records from Mount Sinai Hospital was improper and prejudicial to him because those records are not now available for this court's review. Although the defendant did not object to the procedure adopted by the court, he seeks review of this claim under *State* v. *Golding*, supra, 213 Conn. 239–40. We agree with the defendant that the trial court's failure to retain the records as a sealed exhibit was improper, but conclude that its action was harmless beyond a reasonable doubt and, therefore, that his claim fails under the fourth prong of *Golding*. See footnote 18.

The trial transcript indicates that the defendant initially sought to have Bingham's records from Mount Sinai Hospital marked for identification and sealed for appellate review. A representative of the hospital, however, appeared in court and moved to quash the subpoena issued for those records. The trial court reasoned that because it had already determined that it would not review those records in camera, the records could be returned to the hospital. The defendant agreed to permit the hospital to retain the records, requesting only that the court mark for identification the subpoena issued for the records in order to show that the records existed and had been produced in court. The state also

agreed to this procedure.[20] The trial court marked only the subpoena and returned the records to the hospital.

A trial court has the absolute duty to mark for identification and seal for possible appellate review any such records offered, whether or not an in camera inspection is undertaken, even in the absence of an objection to its failure to do so from the parties. See *State* v. *James*, supra, 211 Conn. 580; *State* v. *Silva*, 201 Conn. 244, 253, 513 A.2d 1202 (1986); *State* v. *Onofrio*, 179 Conn. 23, 34, 425 A.2d 560 (1979); *Duncan* v. *McTiernan*, 151 Conn. 469, 470, 199 A.2d 332 (1964). The trial court's decision to mark for identification only the subpoena was, therefore, improper. In this case, however, because we have concluded that the defendant did not make the threshold showing required to obtain an in camera review of the Mount Sinai Hospital records, and that we need not review the records ourselves, the trial court's failure to preserve properly his records was harmless and could not have affected the outcome of his trial. *State* v. *James*, supra, 580.

## II

The defendant next claims that there was insufficient evidence to prove: (1) that he had the specific intent required to support his murder conviction; and (2) that he, not Ignacak and Bingham, had actually killed the victim. We disagree.

The standard of review employed in a sufficiency of the evidence claim is well settled. "[W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumula-

---

[20] It does not appear that the hospital's motion to quash was acted upon by the trial court.

tive force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993)." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 223, 658 A.2d 571 (1995). Our "review is the same whether the trier is a judge, a panel of judges, or a jury." *State* v. *Perez*, 182 Conn. 603, 606, 438 A.2d 1149 (1981). "[W]e must defer to the [fact finder's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support [its] verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Mejia*, supra, 224. "The credibility of expert witnesses and the weight to be given to their testimony [is also] determined by the trier of fact. . . . In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. (Citations omitted; internal quotation marks omitted.) *State* v. *Steiger*, 218 Conn. 349, 378–79, 590 A.2d 408 (1991); see also *State* v. *Medina*, [228 Conn. 281, 309, 636 A.2d 351 (1994)]; *State* v. *Perez*, [supra, 610]." *State* v. *Patterson*, 229 Conn. 328, 339, 641 A.2d 123 (1994). In viewing evidence that could yield contrary inferences, the fact finder is not required to draw only those inferences consistent with innocence, but may draw whatever inferences from the evidence it deems to be reasonable and logical. *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994). In reviewing the sufficiency of the evidence, we will give "deference not to the hypothesis of innocence posed by the defendant, but to the evidence and the reasonable inferences drawable therefrom that support

the [trier's] determination of guilt. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." Id., 134.

### A

We turn first to the defendant's claim that, in light of the evidence of his intoxication on the night of the murder, a reasonable fact finder could not have concluded, beyond a reasonable doubt, that the defendant had the specific intent required to be convicted of murder. We disagree.

"The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11). . . . *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993)." (Internal quotation marks omitted.) *State* v. *Mejia*, supra, 233 Conn. 223. "Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . These inferences are necessary because the direct evidence of the accused's state of mind is rarely available." (Citations omitted; internal quotation marks omitted.) *State* v. *D'Antuono*, 186 Conn. 414, 423, 441 A.2d 846 (1982).

A criminal defendant's intoxication, although not a defense to murder, is relevant to the issue of whether the defendant had the capacity to form the specific intent required to commit the crime. *State* v. *Traficonda*, 223 Conn. 273, 279, 612 A.2d 45 (1992); *State* v. *Rivera*, 223 Conn. 41, 50, 612 A.2d 749 (1992). "Intoxica-

tion, however, does not automatically negate intent. . . . [I]ntoxication means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body." (Citation omitted; internal quotation marks omitted.) *State* v. *Traficonda,* supra, 279. Intoxication is only relevant to the extent that it is so debilitating as to prevent the defendant from forming the intent to kill. "It is for the [fact finder] to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime with which he is charged." (Internal quotation marks omitted.) Id.

In support of his claim, the defendant relies primarily on his own testimony and that of his expert witness, Peter M. Zeman, a psychiatrist at the Institute of Living. The defendant testified that during the day of the murder, he had consumed fifteen or sixteen beers and four ten milligram doses of Valium between 8 a.m. and 6 p.m., when Bingham and Ignacak arrived. He testified that this had been his daily routine at the time, and presented evidence to show that he was suffering from a severe alcohol and substance abuse condition at the time of the murder and had been for many years before. He claimed that after Bingham and Ignacak arrived, he had consumed two or three "pretty strong" drinks made by Ignacak from vodka and a mixer at the lower camp, and two "big stiff drinks" at the upper camp; he also claimed to have ingested two additional ten milligram doses of Valium after 6 p.m. Finally, he claimed that, as a result of his drinking and Valium ingestion on the day of the murder, he suffered a blackout during the evening, and could not remember anything from the time when Rusinko joined him on the porch after Ignacak's seizure and Bingham knocked Rusinko to the ground, to when he woke to find Rusinko's body already in the fire.

Zeman testified that a blackout state involves a "major disturbance of mental function as a result of alcohol, or a combination of alcohol and other drugs such as Valium," and that a blackout state ordinarily occurs only when a person reaches a blood alcohol level of .25 and is ordinarily accompanied by a loss of memory. Zeman interviewed the defendant three times, for a total of six hours, after the murder. It was Zeman's opinion, based primarily on the defendant's history of alcohol and prescription drug abuse, his account of how much alcohol and Valium he had consumed on the night of the murder and his account of the scope of his memory of the events of that night, that the defendant had experienced a blackout during Rusinko's murder. On cross-examination, however, Zeman acknowledged that the validity of his opinion depended at least in part upon the facts supplied by the defendant as to the extent of his alcohol and Valium consumption that day and his lack of memory.

The state presented substantial evidence to contradict the defendant's claim that he had experienced a blackout during Rusinko's murder and, therefore, that he had been incapable of forming the requisite intent to kill. First, the testimony of Bingham and Ignacak provided both direct and circumstantial evidence of the defendant's intent to kill Rusinko. According to Bingham and Ignacak, whose testimony the trial court found credible, before the murder the defendant said that he was angry with Rusinko for his role in the loss of the defendant's driver's license, and for his role in the defendant's problems with a "drug deal connection." He said several times that Rusinko "had to pay," and talked of killing him. In response to Ignacak's suggestion that he shoot Rusinko instead of killing him, the defendant said that that would be too good for Rusinko, that "he wanted to fuck [Rusinko] up," and, specifically, that he "want[ed] to beat David Rusinko to death."

With regard to the murder, Bingham and Ignacak testified that as the defendant had delivered blows to Rusinko with his hands and feet, he had assigned reasons for them, such as "[t]his is for the DWI, this is for the cocaine, this is for the loss of my license." Bingham then retrieved an aluminum pipe and struck Rusinko with it. After the aluminum pipe bent, Bingham, at the defendant's request, retrieved a steel pipe with which he, and then the defendant, "[f]orcefully," holding the pipe "sometimes . . . like a baseball bat, sometimes . . . with both hands up and over the head and coming down," struck Rusinko.

At some point during the beating, Bingham asked the defendant whether he had done enough damage. The defendant replied "[n]o, that's not enough. I'm going to fuckin' kill him" and stated that if he were to stop at that point, Rusinko might go to the police. He then resumed striking Rusinko in the head with a steel pipe "with what appeared to be all his might." A short time later, the defendant paused to have Bingham break Rusinko's neck. Dissatisfied with Bingham's efforts, he attempted to do so himself by jumping on Rusinko's neck as his head lay propped on the porch railings. Finally, because Rusinko appeared still to be breathing, the defendant asked Bingham for his knife, and when Bingham refused, the defendant used his own knife and then a piece of glass to cut Rusinko's throat, saying "[d]ie . . . why don't you just die." Ignacak indicated, however, that Rusinko was still alive, so the defendant again struck Rusinko's head with a piece of pipe, at which point it was "all blood." Finally, the defendant rolled the victim's body into the fireplace and, using boards pulled off the interior cabin walls, proceeded to incinerate him.

With regard to the defendant's state of sobriety on the night of the murder, Bingham and Ignacak testified that when they had arrived at the defendant's home on

the evening of the murder, they had noticed that he had been drinking, but that, according to Ignacak, he had "seemed fine." Ignacak stated that although she had not paid attention to what the defendant drank that evening, he had appeared intoxicated when the attack on Rusinko began, but had seemed to "sober up" shortly thereafter. She testified further that the defendant had seemed to have been in control of his actions and had had no difficulty in his coordination, either in walking up the hill to the upper campsite or wielding a pipe to beat Rusinko. Bingham also testified that during the extended assault on Rusinko, the defendant had not appeared intoxicated; he spoke normally and had administered blows to Rusinko in a coordinated way, not missing Rusinko once with the pipe.

The state also presented an expert witness, Donald R. Grayson, a psychiatrist. Grayson testified that he believed it was unlikely that the defendant blacked out during the murder, given his ability to perform certain activities during the day and evening and the precision of his memory as to his activities during the day and just prior to Rusinko's murder. Grayson also testified that he felt that the defendant's having related somewhat different accounts of the scope of his memory of the night in question created a doubt about the defendant's credibility on the subject of his memory loss.

The trial court, in its memorandum of decision on the defendant's motion for acquittal, expressly rejected as not credible the defendant's testimony that he could not remember any events between Rusinko's being knocked to the ground and his being burned in the fire, in light of his ability to give "considerable evidence . . . of his physical activities on July 17, 1991, including mowing lawns, working on a small carburetor, riding a motorcycle as well as his detailed claims of alcohol consumption," and the fact that "[i]n all other areas his recollection appeared intentionally vague or non-

existent." The court accepted the testimony of Bingham and Ignacak, testifying "against their penal interest," as to the defendant's participation in Rusinko's death and the burning of his body, and concluded that the defendant was "not so intoxicated by alcohol and/or drugs at the time of the murder that he was incapable of forming a rational intent or of controlling his will. *State* v. *Utz*, 201 Conn. 190, 209 [513 A.2d 1191] (1986)." We conclude that the cumulative effect of all the evidence adduced at trial and the inferences reasonably drawn therefrom amply support the trial court's conclusion that the defendant was able to and did form the specific intent to kill Rusinko.

## B

We next address the defendant's claim that there was insufficient evidence from which a reasonable fact finder could conclude that the defendant committed Rusinko's murder.[21] He argues that the evidence adduced at trial was consistent with the conclusion that Bingham and Ignacak murdered Rusinko, and because the state did not sufficiently refute this hypothesis, that a reasonable fact finder could not have found the defendant guilty beyond a reasonable doubt. We disagree.

Our law on this issue is clear. "That the [finder of fact] might have drawn other possible inferences from these facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt. . . . [I]n viewing the evidence which could yield contrary infer-

---

[21] The defendant asserts this claim in a slightly different manner. He claims that the fact finder could not reasonably have concluded that Bingham and Ignacak had not murdered the victim and thereafter had attempted to implicate the defendant and, therefore, could not have found him guilty beyond a reasonable doubt. Despite the phrasing, the issue remains the same, namely, whether there was sufficient evidence to convict the defendant of Rusinko's murder.

ences, the [finder of fact] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [fact finder's] function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Grant*, 219 Conn. 596, 604, 594 A.2d 459 (1991). If there is conflicting evidence, therefore, the fact finder is free to determine which version of the event in question it finds most credible. "[W]e must defer to the [fact finder's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 278, 623 A.2d 42 (1993).

In this case, the fact finder, in its memorandum of decision on the defendant's motion for acquittal, expressly and reasonably rejected the defendant's "blackout" theory and credited the testimony of the state's witnesses, which clearly supported the underlying conviction for murder. We conclude that, upon the facts so construed and the inferences reasonably drawn therefrom, the trial court reasonably could have concluded that the defendant was guilty of murder beyond a reasonable doubt.

### III

The defendant's last challenge is to three evidentiary rulings made by the trial court.[22] Specifically, he claims

[22] The defendant also claims, in a footnote in his brief, that the trial court's exclusion of the following question to Ignacak on cross-examination violated his constitutional right of confrontation: "Can you describe for me what kind of behavior Mr. Bingham exhibited that makes you say that he was obsessive?" He concedes that his constitutional claim was not properly preserved and seeks to prevail under *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine. This claim, however, is devoid of analysis and of citation to any relevant authority. Therefore, we decline to review it. See footnote 15.

that the trial court improperly: (1) admitted, as impeachment evidence, testimony as to what his behavior was like on a prior occasion at a known blood alcohol level; (2) admitted into evidence several pieces of pipe, which rulings he claims impaired his right to a fair trial; and (3) prevented him on cross-examination from asking Ignacak whether she told two young men after Rusinko's murder that Bingham had "done something awful," in violation of his right of confrontation under the federal and state constitutions. We are not persuaded by the defendant's contentions.

### A

The defendant first claims that the trial court improperly admitted testimony from former Granby police officer Douglas Schlichting regarding the defendant's behavior at a certain known level of intoxication. We disagree.

The following additional facts are relevant to this claim. During the defendant's case, Zeman testified that a blackout state generally occurs at a blood alcohol level of .25 and above, but may occur at lower levels. He also indicated that Valium may produce the same condition, and that combining alcohol and Valium could produce a synergistic effect. He testified that while a person is experiencing a blackout, that person may appear fairly normal to others, particularly when he or she is a heavy drinker and therefore has greater than average tolerance to the effects of alcohol. He indicated that such a person, when experiencing a blackout, may be able to perform the types of tasks that do not require fine coordination or require motor skills that are so frequently practiced that they are automatic, but that his or her "higher levels" of functioning, such as "higher levels of judgment, thinking [and] planning are impaired." It was Zeman's opinion, based on the defendant's history of heavy drinking and prescription drug

abuse, his account of how much alcohol and Valium he consumed during the day and evening of the murder, and his account of the scope of his memory loss regarding the events of the evening, that the defendant had experienced a blackout during Rusinko's murder.

The state presented in rebuttal testimony by Schlichting as to the defendant's condition when he was arrested for drunk driving three months before Rusinko's murder. The defendant's objection to this testimony on relevancy grounds was overruled. Schlichting testified that he had stopped the defendant at approximately 2:30 a.m. on March 3, 1991, because the defendant had been operating his vehicle erratically. Schlichting had noticed that when the defendant exited his vehicle, he held onto the door to support himself and, while walking to the rear of the vehicle, he staggered and braced himself on the vehicle. Schlichting administered a number of field sobriety tests at the scene, including a "horizontal gaze nystagmus test," a "walk and turn test" and a "one leg stand test." From the defendant's performance on each test, Schlichting considered it "quite obvious" that the defendant was intoxicated. Schlichting also testified that he had administered two breathalyzer tests to the defendant, the first at approximately 3:20 a.m., and the second some time later. The first test showed the defendant's blood alcohol level to be .205, and the second showed it to be .203. Schlichting stated that when these tests were administered, the defendant was still in largely the same condition as when he had stopped him. He also testified on cross-examination that during booking, the defendant had stated that he was not drug-dependent but that he was taking Valium and Doriden.

The defendant argues that Schlichting's testimony was irrelevant because it was not known when it was presented whether the defendant's condition when Schlichting arrested him had been affected by his con-

sumption of prescription drugs or what his blood alcohol level had been on the night of the murder. The state argues that the evidence was relevant to rebut Zeman's testimony as to whether the defendant would likely exhibit signs of intoxication when his blood alcohol level was high.

It is well established that "[t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence." *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." *State* v. *Avis*, 209 Conn. 290, 298, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Sauris*, 227 Conn. 389, 406–407, 631 A.2d 238 (1993).

Schlichting's testimony that the defendant exhibited obvious signs of impairment at a blood alcohol level of approximately .205 could reasonably support an inference that it was less likely that he was a person who would not exhibit signs of substantial motor impairment at the level at which a blackout would normally occur and at lower levels before he reached the level required for blackout. In fact, Grayson made just these comparisons in his testimony. Grayson testified that the information provided by Schlichting as to the defendant's

condition provided a "relatively valid base line as to what type of motor impairment would be expected at a certain blood level." Grayson calculated that the defendant had had a blood alcohol level of approximately .21 when Schlichting had arrested him, and also calculated that, based on the amount of alcohol the defendant claimed at trial to have consumed throughout the day and evening of Rusinko's murder, the defendant's blood alcohol level on July 17, 1991, at the time that the group left the lower camp to move to the upper camp had been approximately .21. He concluded, in light of Schlichting's testimony, that he would expect the defendant to have exhibited motor control difficulty at a .25 blood alcohol level that would affect his balance, his ability to swing a steel pipe and to speak clearly, and that he would expect the defendant to have experienced gross motor control difficulties at .21 and above on the night of the murder. This evidence, combined with Ignacak's and Bingham's testimony, which the court expressly found credible, that the defendant's motor skills did not appear to be significantly impaired prior to or during the murder, could render the defendant's testimony as to his state of intoxication on the night of the murder less credible. That the defendant may have ingested more or different prescription drugs on the night he was arrested than on the night of Rusinko's murder, on which issue he was free to offer evidence, went to the weight to be accorded Schlichting's testimony, rather than to its admissibility. The trial court did not, therefore, abuse its discretion in admitting this testimony.

B

The defendant next claims that the trial court improperly admitted into evidence several pieces of charred steel pipe and a piece of aluminum pipe. The defendant argues that these items were not adequately identified as those used in the commission of Rusinko's murder

and, therefore, that this evidence lacked proper foundation. We disagree.

At trial, the state sought to introduce several pieces of metal pipe through the testimony of state police Sergeant John Buturla. The defendant's objection to the admission of the pipes was overruled. Buturla testified that the pieces of pipe, one aluminum and several steel, had been found by police, in his presence, on the ground "right off of the porch" of the cabin at the upper camp approximately three weeks after the murder, and that each was in the same condition at trial as it was when it had been found. He acknowledged that there had been other pieces of pipe in the area of the cabin when the police retrieved those sought to be introduced, but stated that the aluminum pipe sought to be admitted had been the only such pipe in that area that was bent and dented.

The defendant argues that because the pipes introduced into evidence had not been conclusively identified, when the state sought to introduce them, either as being the pipes used in Rusinko's murder or as being similar to those pipes, there was insufficient foundation laid for their admission. We disagree with the defendant that, in order to admit the pipes into evidence, the state was required to first provide such a conclusive identification.

With regard to identity, "[a]ll that is required before a weapon may be introduced into evidence is a sufficient foundation demonstrating circumstances justifying an inference of the likelihood that the weapon was used in the course of the crime charged. . . . The [state] is not compelled to establish that the particular weapon to be introduced was the actual weapon used in the commission of the crime." (Citations omitted.) *Commonwealth* v. *Fromal*, 392 Pa. Super. 100, 125, 572 A.2d 711 (1990); see also *Aiken* v. *State*, 101 Md. App. 557,

573, 647 A.2d 1229 (1994), cert. denied, 337 Md. 89, 651 A.2d 854 (1995) ("physical evidence need not be positively connected with the accused or the crime to be admissible; it is admissible where there is a reasonable probability of its connection with the accused or the crime, the lack of positive identification affects only the weight of the evidence" [internal quotation marks omitted]); *Commonwealth* v. *Brown*, 467 Pa. 512, 520, 359 A.2d 393 (1976) ("[i]f a proper foundation has been laid, weapons . . . although not actually identified as those actually used . . . *which from the circumstances of the finding, justify an inference of the likelihood of their having been used*, are admissible" [emphasis in original; internal quotation marks omitted]). With regard to the condition of the item, "the trial court should consider the nature of the article, the circumstances surrounding the preservation and custody of it, and the possibility of intermeddlers tampering with it." (Internal quotation marks omitted.) *State* v. *Stepney*, 191 Conn. 233, 245, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

When the pipes were offered into evidence, Bingham had already testified that one aluminum pipe and a number of steel pipes were used by him and the defendant to beat Rusinko. He had testified that the aluminum pipe was fairly long, that it bent while he was striking Rusinko with it and that, after it bent, he threw it off the porch of the cabin. He had also testified that the steel pipes used to beat Rusinko were each approximately two feet long with one flared end, that one of them was knocked off the porch and the remaining pieces were placed in the fire with Rusinko's body, and that, when he and the defendant returned to the cabin after the murder, he threw the burned steel pipes off the porch.

In light of Bingham's testimony as to the characteristics, the condition and the manner of his disposal of the pipes used to beat Rusinko, and Buturla's testimony that the pipes offered into evidence, which were similar in appearance to those described by Bingham, were found on the ground near the porch of the cabin and were in substantially the same condition at trial as when they were retrieved by the police, we conclude that there was a sufficient foundation to support an inference that they had been used to beat Rusinko and had thereafter been thrown off the porch by Bingham. Accordingly, the pipes were properly admitted into evidence.

## C

The defendant's last claim is that the trial court violated his federal and state constitutional rights of confrontation when it prohibited him from asking Ignacak on cross-examination whether, shortly after the murder, she had told two men that Bingham "had done something awful." He concedes that his constitutional claim was not made at trial and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, and the plain error doctrine. We conclude that the defendant presents simply an evidentiary claim, and that the trial court's ruling did not constitute an abuse of its discretion.

During cross-examination, Ignacak testified that she had known Charles and John Northrop from high school, that she had dated John, and that she had visited an arcade with both of them on one occasion some time after the murder. The defendant asked Ignacak whether she recalled having told them on that occasion that "Brian [Bingham] had done something awful." The state objected on hearsay grounds and the defendant argued that the statement was offered to contradict Ignacak's testimony implicating the defendant in Rusinko's murder. The trial court sustained the state's

objection. On appeal, the defendant claims that this line of inquiry was relevant to his defense that Ignacak and Bingham, and not he, had killed Rusinko because it "might well have produced a particularly telling prior inconsistent statement," and that, "[b]ecause [it] probably would have affected the outcome [of his trial], a new trial is required."

In reviewing this claim, we note, as an initial matter, that the defendant provides virtually no analysis of the confrontation issue he invokes for the first time on appeal. As such, we decline to review it under the *Golding* doctrine, and treat it, as the defendant does, as simply an evidentiary challenge. See id., 240 ("The defendant . . . bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label."). "It is a fundamental rule of appellate review of evidentiary rulings that if error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985).

The only basis on which the defendant offered Ignacak's alleged prior statement that "Brian [Bingham] had done something awful," was as an inconsistent statement. "As an evidentiary matter, evidence of a witness' prior inconsistent statement is admissible to attack the witness' credibility. . . . A statement is admissible as a prior inconsistent statement, however, only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Citations omitted.) *State* v. *Avis*, supra, 209 Conn. 302. As the trial court pointed out, Bingham's participation

in Rusinko's murder as described by Ignacak was "something awful," and the statement, therefore, was not inconsistent with Ignacak's prior testimony as to Bingham's and the defendant's participation in the murder. The defendant failed to offer any additional basis from which to conclude that the statement, or others related to it in the conversation between Ignacak and Charles and John Northrop, would contradict her testimony that the defendant and Bingham had committed the murder. As such, we conclude that the trial court did not abuse its discretion in excluding it. Because we find no error in the trial court's ruling, the defendant's plain error argument also fails. See Practice Book § 4185; *State* v. *Hinckley*, 198 Conn. 77, 87–88, 502 A.2d 388 (1985) (plain error review "reserved for the truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings").

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN and PALMER, Js., concurred.

BERDON, J., dissenting. A criminal defendant has the right to an in camera inspection of a witness' confidential records, for the purpose of gathering information to impeach the witness, if there is "*any reasonable basis*" for believing that the records have information "that might affect his testimony." (Emphasis added.) *State* v. *Pierson*, 201 Conn. 211, 228, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268, cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989). I am pleased that the court makes this standard clear and overrules *State* v. *D'Ambrosio*, 212 Conn. 50, 59, 561 A.2d 422, cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990), which employed

the standard of "reasonable probability," to the extent that it is inconsistent.

In *Pierson,* we acknowledged that "absent any knowledge of the contents of [a witness'] psychiatric records, it is impossible to determine whether they included relevant impeaching evidence that was not cumulative or was contrary to her testimony and that [t]o rely on the testimony actually elicited on cross-examination in assessing whether the defendant's [confrontation] rights were violated would involve pure speculation as to the contents of the witness' records." (Internal quotation marks omitted.) *State* v. *Pierson,* supra, 201 Conn. 226. Because of our concern for the defendant's right to confront witnesses, "we have not insisted upon a determination that the confidential communications of the victim were inconsistent with his testimony at trial before an in camera review may be conducted by the court . . . of the record of those prior statements." Id., 227. Rather, if the defendant demonstrates, outside the presence of the jury, that "there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness," the trial court should conduct an in camera inspection. *State* v. *Howard,* 221 Conn. 447, 457, 604 A.2d 1294 (1992), citing *State* v. *D'Ambrosio,* supra, 212 Conn. 58. Writing for a unanimous court, Justice Hull, in *State* v. *Hufford,* 205 Conn. 386, 404–405, 533 A.2d 866 (1987), made it clear that the standard must be "any reasonable basis" because a more onerous threshold would violate the confrontation clauses of our federal and state constitutions.[1]

---

[1] In *State* v. *Hufford,* supra, 205 Conn. 402, this court stated: "We rest this holding not only on the requirements of the federal constitution, but also on independent and adequate state constitutional grounds. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; see *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *State* v. *Jarzbek,* [204 Conn. 683, 707–708, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)]."

The court in *Hufford* explained that "[w]here, as here, the records sought are privileged, the witness' right to privacy must be weighed against the criminal defendant's right to bring to *the jury's attention facts affecting the witness' credibility.* . . . The linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation. As in the case of admissibility of such records, access to records bearing on the mental unsoundness of a witness (i.e., relating to a trait importing in itself a defective power of observation, recollection or communication), at or around the time of trial or of the occurrence about which he is to testify . . . should be granted to the defendant." (Citations omitted; internal quotation marks omitted.) Id., 402–403.

I believe that the defendant in this case made this threshold showing thereby requiring the trial court to review Cara Ignacak's and Brian Bingham's confidential records in camera. The object of the defendant's inquiry is not only to challenge the witnesses' testimonial capacity, but *also* to gather any information that would impeach the witnesses' credibility. Id., 400. As participants in the crime, both Ignacak and Bingham were essential witnesses for the prosecution. This is especially so since there were no other witnesses and the defendant testified that for most of the evening he blacked out and is not able to recall what occurred. Therefore, conviction of the defendant hinged on whether the jury credited Ignacak's and Bingham's testimony. Consequently, it was vital for the defendant to

The constitution of Connecticut, article first, § 8, provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

have a full opportunity to impeach Ignacak's and Bingham's credibility.

On direct examination, both Ignacak and Bingham conceded that, during the police investigation, they had concealed information and had lied. Additionally, testimony was presented that both had social and psychiatric problems that required treatment. At a minimum, Ignacak's and Bingham's mental soundness must be questioned as they either assisted in or watched the fatal beating and incineration of another human being without any expression of horror or disgust. More specifically, there was testimony that Ignacak received psychiatric therapy on an inpatient and outpatient basis because of her difficulty in recalling events, as well as her interpersonal difficulties. Similarly, Bingham was hospitalized for emotional and substance abuse problems. With this evidence, the defendant met his threshold burden of demonstrating that there was a reasonable basis for believing that impeaching information was contained in Ignacak's and Bingham's confidential records.

Indeed, the facts of *Hufford* underscore that the defendant in this case met that threshold showing. In *Hufford*, we held that on voir dire, the defendant made the requisite showing merely by presenting the hospital records that contained nursing notes in which the witness was described as being "diagnosed as having a social problem and histrionic personality disorder." Id., 404–405. On the basis of those nursing notes alone, we held that "the defendant [had] made the requisite showing that there were reasonable grounds to believe that there were psychiatric records or information pertaining to the complainant's mental condition bearing on her testimonial capacity and reliability as a witness." Id., 404.

The majority seems to lose sight that this threshold showing is preliminary. It is not determinative of

whether the records are available for use by the defendant's counsel in his or her cross-examination of a witness. Rather, the showing merely allows an in camera inspection to determine whether any admissible impeaching evidence is contained in the records. " 'If no admissible impeaching evidence is discovered, the entire record of the proceeding [should] be sealed for possible appellate review.' " Id.

Under the majority's analysis, the defendant is twice placed in a "catch-22" situation. First, the precise reason the defendant wanted to have the witnesses' records reviewed in camera was to determine whether they contained any material that would be admissible to impeach the credibility of Ignacak and Bingham. If the defendant had knowledge of the contents of the records, then an in camera review would not be necessary. Nevertheless, the majority somehow expects the defendant, who is ignorant of the contents of the records, to produce sufficient evidence to demonstrate that there is "a reasonable probability" that records contain admissible impeachable information.

Second, the majority, which agrees in theory that there need only be a mere "reasonable basis showing," in practice extends that standard beyond all contemplation and refuses to review the trial court's unreasonable evidentiary restrictions that prevented the defendant from making a fuller threshold showing during voir dire.[2] Contrary to the majority's belief, these restrictions constituted constitutional error, because they directly

---

[2] The trial court made several evidentiary rulings that restricted the defendant's ability to conduct a thorough voir dire. For example: (1) the trial court barred the defendant from asking Ignacak if she had told friends that Bingham "had done something awful"; (2) the defendant was precluded from asking Ignacak and S. Patricia Keener, the director of special education at Ignacak's and Bingham's high school, how Ignacak's difficulty getting along with people manifested itself; and (3) the defendant was precluded from asking Keener if there was a diagnosis that led her to refer Ignacak for psychiatric treatment.

implicated the state constitution's confrontation clause. See *State* v. *Grasso*, 172 Conn. 298, 302, 374 A.2d 239 (1977) ("[w]hen a conviction depends entirely upon the testimony of certain witnesses, as it did in the present case, information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created").

Accordingly, I would remand this case to the trial court with direction to conduct an in camera inspection of the records of both Ignacak and Bingham.[3] In my view, under our state constitution, such an in camera inspection must be done through the eyes of the advocates—that is, with both defense counsel and the state's attorney. To preserve and respect the witness' privacy interest, counsel should be placed "under strict order from the trial court . . . not [to] disclose any material, other than that permitted by the trial court . . . ." *State* v. *Harris*, 227 Conn. 751, 779, 631 A.2d 309 (1993) (*Berdon, J.*, dissenting). Indeed, Justice Abe Fortas, writing for the majority, advanced a cogent argument, in the

[3] I am aware of the procedure established in *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984), which requires, after the defendant has shown "that there is reasonable ground to believe that the failure to produce the [confidential] information is likely to impair the defendant's right of confrontation . . . . Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information . . . . If the defendant does make such [a] showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness." The *Esposito* court laudably attempts to accommodate both the privacy rights of the witness and the confrontational rights of the accused. Sometimes, however, in the interest of justice, this accommodation cannot be made. With respect to confidential records, those privileges must give way to the state's overriding interest in obtaining just convictions and the accused's constitutional right to confrontation. Accordingly, I would abandon the requirement that the state be required to obtain the witness' consent for the in camera review of the witness' records. The trial court's order mandating the attorneys not to disclose any of the confidential information is a sufficient safeguard to protect the privacy right of the witness, while taking into account the defendant's right to confrontation.

context of reviewing secret grand jury proceedings, of why that review must be made through the eye of the advocate. "Trial judges ought not to be burdened with the task or the responsibility of examining sometimes voluminous [records] in order to ascertain inconsistencies with trial testimony. In any event, it will be extremely difficult for even the most able and experienced trial judge under the pressures of conducting a trial to pick out all of the grand jury testimony that would be useful in impeaching a witness. . . . Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." (Citation omitted; internal quotation marks omitted.) *Dennis* v. *United States*, 384 U.S. 855, 874–75, 86 S. Ct. 1840, 16 L. Ed. 2d 973 (1966).

If such an in camera inspection produces information that could have been the basis for properly impeaching either or both witnesses, the defendant's conviction must be set aside and a new trial ordered.

Accordingly, I respectfully dissent.