STATE OF CONNECTICUT *v.* JOSE ARCIA
(AC 28433)

Bishop, Gruendel and Peters, Js.

Argued September 23—officially released November 25, 2008

*Kirstin B. Coffin*, special public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Chris A. Pelosi*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Jose Arcia, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] He alleges evidentiary error and instructional impropriety. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant met O[2] in 1996, and a romantic relationship ensued. In the fall of 1999, O and her daughters, E, L, and J, moved into the defendant's condominium in Hartford. At that time, E was thirteen years old.

Upon their moving into the condominium, the relationship between O's daughters and the defendant changed. The defendant became stricter with the girls, frequently punishing them for violating certain rules by having them kneel on the floor with their arms extended

---

[1] General Statutes § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony . . . ."

We note that the conduct that gave rise to the risk of injury charge allegedly occurred between March, 1999, and October, 2002. Although § 53-21 was amended during that time, there is no dispute that the conduct in which the defendant allegedly engaged was prohibited under all of the revisions of the statute applicable during that time period. In the interest of simplicity, we refer to the current revision of § 53-21.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

and palms up. The defendant at times placed books on their open palms, which he testified was a form of corporal punishment that he learned in Nicaragua.

Furthermore, after the girls moved into the defendant's condominium, the defendant began to touch E's intimate parts. At trial, E detailed several physical encounters with the defendant. For example, while lying on the defendant's bed watching television with him, E confided in the defendant that she was experiencing problems with her boyfriend. The defendant responded by digitally penetrating E's vagina, telling her that this was what her boyfriend was supposed to do. On another occasion, E was taking a shower when the defendant entered. Once in the shower with E, the defendant shaved her pubic hair. He then instructed E to go to his bedroom and lie down. The defendant then digitally penetrated E's vagina and fondled her breasts. E testified that the defendant touched her inappropriately on a regular basis.

In November, 2002, the defendant ended his relationship with O. Sometime thereafter, E informed her older sister, J, that the defendant had sexually assaulted her. J shared this information with O, who contacted the police. The defendant subsequently was charged by information with twelve counts alleging sexual assault and risk of injury to a child.[3] Following a trial, the jury found the defendant guilty of one count of sexual assault in the second degree in violation of § 53a-71 (a) (1) and one count of risk of injury to a child in violation of § 53-21 (a) (2); it found him not guilty of the remaining counts. The court denied the defendant's subsequent motions for a judgment of acquittal and for a new trial, and rendered judgment in accordance with the verdict.

[3] The amended information included four counts pertaining to the alleged sexual assault and risk of injury to L. Because the jury found the defendant not guilty of those charges, we do not detail them here.

It sentenced the defendant to a total effective term of fifteen years incarceration, execution suspended after eight years, with ten years of probation. This appeal followed.

## I

The defendant claims that the court improperly admitted into evidence E's journal.[4] That claim is governed by the abuse of discretion standard of review. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 532, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

The following additional facts are relevant to the defendant's claim. On direct examination, E testified that the defendant began touching her intimate parts shortly after her family moved into his condominium, and she detailed several specific incidents. E also testified that she never told anyone about those incidents "because [the defendant] had control of everything and if I would have told my mom, she would have kicked me out like she did to my sister because [the defendant] told her to. . . . My mom wouldn't believe me. She was in love with [the defendant]."

On cross-examination, the defendant sought to impeach E's testimony. Defense counsel confronted E with her February 5, 2004 written statement to the police, referring to inconsistencies in her testimony on

---

[4] The terms journal and diary are used interchangeably in both the parties' briefs and the record before us.

direct examination. Defense counsel repeatedly questioned E as to her statement to the police that the defendant had engaged in anal intercourse with her "[every day, two] or three times a day" when she was thirteen years old and in the seventh grade. In response, E testified that "yes, it would be two or three times a day." On redirect examination, E explained that her reference to "two or three times a day" pertained to sexual encounters generally. She stated that when she made that remark, she "meant everything. . . . When he used to finger me, when he used to touch me, when he used to take a shower with me. When you say 'every day,' it was because I lived in a hell." In addition, E acknowledged on cross-examination that she was unsure precisely when that assault began, stating, "I don't know the year," and, "I'm not doing the math." E also conceded that she did not initially inform her mother or sisters of her sexual encounters with the defendant.

During cross-examination, defense counsel also asked E about discussions she had with counselors. Defense counsel then raised the subject of E's journals:

"[Defense Counsel]: In front of [your counselors], did you ever say that you had journals or diaries of all the sexual abuse that [the defendant] had committed as the acts were taking place?

"[The Witness]: I never said . . . all my journals were about him.

"[Defense Counsel]: No, I'm not suggesting that all your journals were about him. But didn't you say that you wrote down everything he had done to you in the diary?

"[The Witness]: I write everything that happens to me in my diary.

"[Defense Counsel]: All right. And didn't you tell [your counselors] when you were interviewed, that you had these journals or diaries that talked about what [the defendant] had done to you?

"[The Witness]: Yes, I had my journals.

"[Defense Counsel]: Right. And what you had said to them was that you were writing down in your diary as these things were happening, correct?

"[The Witness]: Yes.

"[Defense Counsel]: All right. And you went to get your diaries today, didn't you?

"[The Witness]: Yes.

"[Defense Counsel]: And nothing is in there; isn't that right?

"[The Witness]: Cause those are not the only diaries I have.

"[Defense Counsel]: Oh, okay. Where are the other diaries that talk about what [the defendant] did to you?

"[The Witness]: I don't know because I moved out from my mom's house."

Later, on recross-examination, counsel for the defendant again asked: "[T]he diaries where you claim you wrote about all the things that [the defendant] did to you while they were happening have . . . disappeared? . . . Where are they now?" E admitted that she did not know the whereabouts of those journals.

On July 13, 2006, Detective Naomi Rivera Cagianello of the Hartford police department testified that she took statements from L, J and O on May 14, 2003, and from E on February 5, 2004. Following her testimony and outside of the courtroom, Cagianello asked the prosecutor why he had not inquired about "the journal entry."

Cagianello indicated that "although not in the warrant, she had tagged as evidence a journal given to her by E at the time that E provided her written statement to her." It is undisputed that prior to that time, neither the state nor the defendant was aware of that journal's existence, as Cagianello had not mentioned it in her police report or trial testimony. In addition, counsel for the defendant informed the court that "as to the chain of custody and how the events took place, we're obviously not claiming any bad faith . . . ."

On July 17, 2006, the state sought to offer into evidence two portions of the recently discovered journal. After hearing from both parties on the matter, the court concluded that the journal entries were admissible on three grounds. It stated: "The portions that the state seeks to introduce will be admitted to corroborate E's testimony that the defendant had contact with her intimate parts as charged in counts five and six . . . . It is evidence that tends to show why E did not disclose the abuse at the time . . . . It is also a prior consistent statement to rebut a claim of recent fabrication, as the [defendant] in his impeachment of E sought to discredit her and [to imply] that she was testifying falsely. The statement is trustworthy, having been written contemporaneously with the events, [and] the witness is here and subject to cross-examination. The court finds that the probative value outweighs the prejudice to the defendant, and it will be admitted."

E subsequently was recalled to testify about the two journal entries and confirmed that the journal belonged to her and was written by her hand. The state then moved for the admission of the two journal entries, which the court granted after noting the defense counsel's objection. E then read into the record the first entry from her journal: "I like my mom, but sometimes I think I like [the defendant], but I do not like when he be feeling on me; I just don't like when he do those

things when I'm going to sleep or going to see television." E testified that when she wrote, "I do not like when he be feeling on me," she meant the defendant's touching of her vagina, breasts and buttocks. E next read into the record the second entry from her journal: "My mom thinks [the defendant] is a good man, but he is not. He is always feeling on me; he is always doing that to me. For me to go out with my friends when my mom say no, he says yes but only if he could feel on me, and that's the only way I could go out. But I do hurt when he be doing this." E testified that she had to allow the defendant to touch her intimately before he permitted her to go out with friends and that he had hurt her physically and mentally. She stated that "I was scared, and it hurt because I gave him a trust and he broke that trust." Defense counsel thereafter did not cross-examine E.

On appeal, the defendant claims that the court abused its discretion in admitting into evidence the journal entries. We do not agree. The court properly admitted the journal entries as prior consistent statements offered to rebut a charge of recent fabrication.[5]

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Prior consistent statements of a witness are generally regarded as hearsay and are not admissible at trial, either for their truth or for the purpose of rehabilitating a witness' damaged credibility. . . . This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached . . . by a claim of recent fabrication . . . . When a prior

---

[5] Because we conclude that the court properly admitted the journal entries as prior consistent statements offered to rebut a charge of recent fabrication, we do not consider alternate grounds of admission.

consistent statement is admitted under [that exception], it is admitted to affect credibility only and not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 803–804, 709 A.2d 522 (1998). One noted commentator explained the rationale for that exception: "Impeachment on the ground of recent contrivance . . . is more nearly connected with the case of impeachment by self-contradiction. The charge of recent contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did not speak of the matter before, at a time when it would have been natural to speak; his silence then is urged as inconsistent with his utterances now, i.e., as a self-contradiction . . . . The effect of the evidence of consistent statements is that the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story . . . ." (Citation omitted.) 4 J. Wigmore, Evidence (Chadbourn Rev. 1972) § 1129, pp. 270–71.

Accordingly, § 6-11 (b) of the Connecticut Code of Evidence provides in relevant part that "[i]f the credibility of a witness is impeached by . . . (3) a suggestion of recent contrivance, evidence of a prior consistent statement made by the witness is admissible, in the discretion of the court, to rebut the impeachment." As our Supreme Court recently stated, "the determination of whether to allow the introduction of a prior consistent statement for rebuttal purposes is left to the sound discretion of the trial court. . . . [I]n stating that evidence of a witness' prior consistent statement is admissible in the discretion of the court, [§] 6-11 stresses the broad discretion afforded the trial judge in admitting this type of evidence." (Citations omitted; internal quotation marks omitted.) *Daley* v. *McClintock*, 267 Conn. 399, 412, 838 A.2d 972 (2004).

In the present case, the court acted well within its discretion in allowing the state to introduce the journal excerpts to rebut a suggestion that E recently contrived her testimony. During cross-examination, defense counsel repeatedly confronted E with her February 5, 2004 written statement to the police, in which she stated that "[t]his happened [every day, two] or three times a day." After establishing that E had stated that she wrote in her journal everything that the defendant had done to her and that she did so "as these things were happening," he inquired, "[a]nd you went to get your diaries today, didn't you?" When E answered affirmatively, defense counsel stated: "And nothing is in there; isn't that right?" In addition, the following colloquy occurred during defense counsel's recross-examination of E:

"[Defense Counsel]: Now, I believe we went over this in [cross-examination], but you had indicated, when you were interviewed . . . that you had journals or diaries where you recorded what [the defendant] was doing to you at about the time that it happened, correct?

"[The Witness]: Yes, I had journals.

"[Defense Counsel]: That's what you told them. But now you've brought some journals to court here today, correct?

"[The Witness]: Yes.

"[Defense Counsel]: An inspector from the prosecutor's office went to Manchester to get those diaries for you, right, this morning?

"[The Witness]: Yes.

"[Defense Counsel]: But the diaries where you claim you wrote about all the things that [the defendant] did to you while they were happening, those have miraculously disappeared?"

After the state objected to the term "miraculously" and the court sustained the objection, defense counsel again asked E the location of the journal containing her accounts of the alleged assaults, to which E replied that she did not know.

In *State* v. *Hines,* supra, 243 Conn. 796, the Supreme Court stated that "it is irrelevant that the defendant did not expressly pursue a theory of recent fabrication. The only relevant inquiry is whether the jury reasonably may have been left with the impression that [the witness'] testimony was a recent fabrication." Id., 804–805. The court reasoned that "[i]t is not necessary that the impeachment be explicit, i.e., that an actual allegation of recent fabrication be made, but only that a jury be able to reasonably infer that such is occurring." (Internal quotation marks omitted.) Id., 805. It thus held that "[w]hen a trial court reasonably can conclude that there was sufficient evidence to permit a jury to draw an inference of recent fabrication, it may admit a prior consistent statement for rehabilitative purposes." Id., 806.

Such is the case here. In light of the foregoing colloquies between counsel for the defendant and E, the court reasonably could conclude, as it did, that defense counsel "in his impeachment of E sought to discredit her and [implied] that she was testifying falsely." E's inability to produce or to refer to any statement in her journals concerning the alleged sexual assault, when considered in tandem with her earlier statement that she had written in her journal everything that the defendant had done to her as it was happening and her admission that she did not initially tell her mother or sisters about her sexual encounters with the defendant, could lead the jury to conclude that her testimony was recently fabricated. Moreover, the journal entries admitted into evidence contained statements consistent with E's trial testimony. Affording the court broad discretion

and indulging every reasonable presumption in favor of the court's ruling as our standard of review requires, we cannot say that the court abused its discretion in admitting into evidence, as prior consistent statements, E's two journal entries.

## II

The defendant next contends that the court improperly instructed the jury on the statutory requirements of § 53-21.[6] At trial, the defendant neither filed a request to charge nor objected to the jury instructions that ultimately were given by the court. Because he did not properly preserve that claim, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] We review the defendant's claim because the

---

[6] The defendant also claims that the court improperly failed to provide a limiting instruction to the jury regarding the admission of E's journal entries. The defendant failed to preserve that claim at trial and now requests *Golding* review. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). This court has held that the failure of the trial court, sua sponte, to provide such a limiting instruction is not of constitutional dimension. We stated: "[T]he failure of the trial court to give a limiting instruction concerning the use of evidence . . . is not a matter of constitutional magnitude. . . . Absent a claim of constitutional magnitude, the defendant's unpreserved claim fails to satisfy the second prong of *Golding* and is, therefore, not reviewable." (Internal quotation marks omitted.) *State* v. *Wild*, 43 Conn. App. 458, 467, 684 A.2d 720, cert. denied, 239 Conn. 954, 688 A.2d 326 (1996); see also *State* v. *Ramirez*, 101 Conn. App. 283, 297, 921 A.2d 702 (well established in Connecticut that trial court generally not obligated, sua sponte, to give limiting instruction), cert. denied, 283 Conn. 909, 928 A.2d 539 (2007), cert. denied, 552 U.S. 1109, 128 S. Ct. 895, 169 L. Ed. 2d 747 (2008). The claim fails.

[7] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. *Golding*'s first two prongs relate to whether a defendant's claim is reviewable, and the last two relate to the

record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

In instructing the jury on § 53-21, the risk of injury to a child statute, the court stated in relevant part: "[T]he state must show that the defendant's behavior was likely to impair the child's health or morals. 'Likely' means in all probability or possibly—or possibility rather. Probability or possibility. Thus, the state must show that it was possible or probable that the sexual and indecent behavior of the defendant would injure or weaken E's health or morals. There is no requirement that the state prove actual harm to E's health or morals." The defendant argues, and the state agrees, that the term "likely to impair" does not mean possible, as the court instructed.

Our analysis is governed by the decision of our Supreme Court in *State* v. *Romero*, 269 Conn. 481, 849 A.2d 760 (2004). In *Romero*, the trial court provided a verbatim instruction to the jury on the "likely to impair" requirement of § 53-21 that was identical to that at issue in the present case. Id., 488. On appeal, the Supreme Court concluded that "the term 'likely,' as used in § 53-21 (a), cannot be understood fairly to encompass a meaning of either 'possible' or 'in all possibility' and, therefore, the trial court's instructions to the contrary were improper." Id., 491. The court then considered whether, under *Golding*'s third prong, there existed "a reasonable possibility that the jury was misled by these improprieties." Id., 492. The court analyzed the charge as a whole: "[W]e note that the trial court provided the jury with a thorough explanation of the concept of reasonable doubt and the state's burden of proving each

substance of the actual review. *State* v. *Jarrett*, 82 Conn. App. 489, 492 n.1, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

element of each charge beyond all reasonable doubt. We further note that the trial court's instructions reduced § 53-21 (2) to three elements, reiterating the state's burden as to each of the elements. In this regard, the trial court instructed that the state had to prove beyond reasonable doubt that: (1) [the victim] was under the age of sixteen at the time of the criminal acts; (2) the defendant had contact with [the victim's] intimate parts and, in connection with the second risk of injury count, that the defendant had subjected [the victim] to contact with the defendant's intimate parts; and (3) such contact with intimate parts took place in a sexual and indecent manner that was likely to impair [the victim's] health or morals." Id., 492–93. The court concluded that, viewing the charge as a whole, "there does not exist a reasonable possibility that the jury was misled by the trial court's instructions as to the meaning of the term 'likely' in § 53-21 (2)." Id., 494. Guided by the *Romero* precedent, this court reached a similar result in *State* v. *Michael A.*, 99 Conn. App. 251, 267, 913 A.2d 1081 (2007), and *State* v. *Ritrovato*, 85 Conn. App. 575, 606, 858 A.2d 296 (2004), rev'd in part on other grounds, 280 Conn. 36, 905 A.2d 1079 (2006).

The court's charge in the present case, viewed as a whole, mirrors that at issue in *Romero*. The court provided an extensive explanation of reasonable doubt and the state's burden to establish under that standard that (1) E "was under the age of sixteen at the time of the alleged incident," (2) that "the defendant had contact with the intimate parts of E," and (3) that "the contact with the intimate parts of E took place in a sexual and indecent manner, which was likely to impair the health or morals of a child, that is, E." The court further instructed the jury that said contact "must have taken place in a sexual and indecent manner as opposed to an innocent touching or an accidental, inadvertent or reflexive touching." In addition, the court later correctly

defined "likely," as that term is used in § 53-21, stating that the term "means in all probability or probably" when instructing the jury on an additional risk of injury to a child count. Finally, as the state observes, because the jury found the defendant guilty of having sexual intercourse with someone younger than age sixteen, "it is difficult to imagine a finding that this conduct could not be deemed likely—in the context of probably—to impair [the victim's] morals." *State* v. *Romero*, supra, 269 Conn. 493. Accordingly, we conclude that, considering the instructional impropriety within the context of the entire charge, there is no reasonable possibility that the jury was misled.

The judgment is affirmed.

In this opinion the other judges concurred.