******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NORMAN P.*
(AC 37947)

Sheldon, Prescott and Flynn, Js.

*Argued October 6—officially released December 6, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Kwak, J.)

*Marina L. Green*, assigned counsel, with whom were
*Emily Graner Sexton*, assigned counsel, and, on the
brief, *Michael S. Taylor*, assigned counsel, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *Anne Mahoney*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Norman P., appeals from the judgment of conviction, rendered after a jury trial, of three counts of sexual assault in a spousal relationship in violation of General Statutes § 53a-70b, one count of assault of an elderly person in the second degree in violation of General Statutes § 53a-60b, and one count of assault of an elderly person in the third degree in violation of General Statutes § 53a-61a. On appeal, the defendant claims, among other things, that the trial court improperly (1) refused to admit into evidence his full written statement to the police after portions of the statement had been introduced by the state, and (2) refused to mark for identification the complainant's privileged records from Interval House, an organization that provides counseling and other services to domestic violence victims, as well as declined to conduct an in camera inspection of these records.[1] We agree that the court improperly excluded the defendant's complete statement to the police, and, accordingly, we reverse the judgment of conviction and remand the case for a new trial. Because one of the remaining evidentiary issues is likely to arise again on remand, we address that claim as well.[2] To that end, we agree with the defendant that the court improperly refused to mark the Interval House records for identification and improperly refused to conduct an in camera review of the Interval House records after the defendant made the requisite threshold showing pursuant to *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984).

Given the evidence presented at trial, the jury reasonably could have found the following facts. On the evening of Thursday, August 2, 2012, the defendant was at home with the complainant, who was the defendant's sixty-one year old wife, and their twenty year old son, B.P., who had a strained relationship with the defendant. A dispute over the operation of the air conditioning system arose between the defendant and B.P. A verbal argument between the two, in which the complainant interceded on B.P.'s behalf, soon escalated into a physical altercation. Eventually, in an effort to avoid calling the police and possibly having the two men arrested, the complainant told B.P. that it would be best if he left the house and went to his grandmother's residence. B.P. then left.

Thereafter, the defendant approached the complainant and, using his closed fist, punched her in the chest with such force that it took her breath away. The complainant punched the defendant back, injuring her shoulder in the process, and the defendant began hitting and jabbing the complainant repeatedly in the midsection with the television remote control, causing the complainant severe bruising. The complainant eventually retreated to the upstairs bedroom where she usually slept, away from the master bedroom where the defen-

dant usually slept.

Several minutes later, the defendant entered the complainant's bedroom where she was lying down on the bed, pulled the covers off of her, and stated that he was "going to show [her] something." He then ripped off the nightgown she was wearing, prompting the complainant to attempt to push and kick him away from her. The complainant was unsuccessful in her efforts, however, because the defendant was physically stronger than her, one of her shoulders had no strength as a result of it having been injured earlier, and the defendant was restraining her other uninjured hand. The defendant then began to insert his finger into the complainant's rectum, and the complainant pleaded with him to stop because he was hurting her. The defendant refused and threatened that the more the complainant protested, the harder he would continue the penetration. The complainant soon realized that the defendant was penetrating her with more than one finger and that he was also curling his fingers inside of her, like a hook, pulling at her. At some point during the assault, the complainant saw that she was emitting blood and feces onto the bedsheet.

After a period of time, the defendant directed the complainant to go to the bathroom to wash herself off. He then walked her into the bathroom and to the bathtub, all the while refusing to remove his finger from her rectum. Filling the tub with water and directing the complainant to get in, the defendant proceeded to remove his own clothing and enter the tub with her. The defendant then pulled the complainant onto his lap and began to manipulate a bar of soap into her rectum, although the complainant did not know this at the time because she could not see what he was doing behind her. Consumed with pain, the complainant kept trying to remove the defendant's hand from her rectum, but was unable to overcome his strength. Eventually, the complainant complained that her stomach was cramping and that she needed to move her bowels, so the defendant released her and allowed her to sit on the toilet. In addition to emitting blood and feces, the complainant expelled the bar of soap into the toilet, thereby realizing for the first time that he had pushed the soap inside of her.

Afterward, the defendant led the complainant back into the complainant's bedroom, and the complainant, overcome with exhaustion, could not attempt to fight him any longer. The defendant proceeded to lean the complainant over the bed and penetrate her rectum with his penis and fingers. After the defendant stopped the assault, he fell asleep on the bed, and the complainant lay crying on the floor.

Eventually, near daylight, the complainant got up, got dressed, and began wandering on foot around the streets in her neighborhood. The complainant

attempted to telephone a friend of hers and a friend of the defendant, but neither answered, so the complainant called the defendant's brother, and told him about the assault. At some point while she was walking, the complainant felt "a gush [of wetness] come down in [her] pants" and, after returning to the house, discovered that she had had an involuntary bowel movement that was mixed with blood and "white stuff," which she assumed was from the bar of soap. She cleaned herself off and lay down on the couch in the basement until it was time for her to go to work in the afternoon.

Although the complainant had difficulty walking because of her injuries, she went to work that Friday, Saturday, and Sunday because she did not want to be alone in the house with the defendant. On Monday evening, the complainant confided in her close friend and coworker about the assault, and accepted the friend's invitation to stay the night at her house. The next day, on Tuesday, the complainant saw her primary care physician, told him of her injuries, and informed him that they had been the result of an assault by the defendant. The doctor diagnosed the complainant with a rectal tear and ultimately referred her to Interval House for counseling.

On Thursday, almost one week after the assault, the complainant took her car to a shop to be serviced. While at the service shop, the complainant experienced another involuntary bowel movement and decided at that point that she would report the assault to the police. The complainant then drove straight from the service shop to the police station, where the authorities took her statement and, thereafter, accompanied her to her home to collect evidence. When the defendant arrived home from work that day, he encountered the police outside his house. Upon request, he followed a police detective to the police station. During an interview with the detective, he gave a sworn written statement concerning the events that occurred on August 2 and 3, 2012. The following day, the defendant was arrested pursuant to an arrest warrant.

Prior to trial, on December 5, 2014, the state filed a substitute long form information, charging the defendant with four counts of sexual assault in a spousal relationship in violation of § 53a-70b, one count of criminal attempt to commit sexual assault in a spousal relationship in violation of General Statutes §§ 53a-49 and 53a-70b, one count of second degree assault of an elderly person in violation of § 53a-60b, and one count of third degree assault of an elderly person in violation of § 53a-61a. During his jury trial, the defendant testified that the sexual encounter with his spouse had been consensual, and that her rectal injuries had been caused by the defendant using his fingers to retrieve a small piece of soap that had accidentally slipped inside of her when the defendant was lubricating her anal area

for intercourse. Following the trial, the defendant was convicted on all but two of the counts.[3] He was sentenced to a total effective term of thirty-six years of imprisonment, execution suspended after twenty-four years, with ten years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We turn first to the defendant's claim that the court improperly refused to admit the defendant's complete sworn statement to the police after other portions of the statement had been introduced by the state during trial. Specifically, the defendant argues that the court misinterpreted § 1-5 (b) of the Connecticut Code of Evidence and that, pursuant to § 1-5 (b), the entire statement should have been admitted in order for the jury to understand the context of those portions that were previously introduced by the state during its cross-examination of the defendant. In response, the state argues that the court properly ruled that the police statement constituted nothing more than a prior consistent and self-serving hearsay statement offered by the defendant to boost his favorable testimony through repetition. The state further asserts that "nothing in the defendant's police statement provided any 'context' essential to a proper understanding of the inaccuracies and omissions pointed out by the state on cross-examination and fully conceded by the defendant on cross-examination, with an explanation." We agree with the defendant.

The following additional facts and procedural history are relevant to this claim. During cross-examination of the defendant, the prosecutor questioned him at length about what was included and what was not included in his signed statement to the police, dated August 9, 2012. The prosecutor asked the defendant to verify that he made several declarations about the events that occurred on August 2 and 3, 2012, in his signed police statement, including the type of sexual intercourse he engaged in with the complainant, when he used the bar of soap, the state of the bedroom where the alleged assault occurred, whether the complainant ever told him she was in pain, when he next saw the complainant after the alleged assault, and what occurred during his altercation with B.P. on the night in question. Although the defendant confirmed for the jury that he had, in fact, told the police many of these details, he disputed the accuracy of other assertions contained in the written account. For example, when the prosecutor asked him if "you signed the statement that said that after the vaginal intercourse, you went to the bathroom to look for a bar of soap," the defendant replied: "I told the police it wasn't a bar. A piece of soap, I told the police. . . . [The police officer] . . . said in America it is called a bar." Similarly, when the prosecutor asked if

"you told the police that you had penile/vaginal sex with your wife," the defendant attested that "[t]hat was a mischaracterization" and that "[t]hose words were inserted by the police. Those are not my words."

When the prosecutor questioned the defendant about details concerning the alleged assault that he had testified to at trial, but were not contained in his signed statement, the defendant repeatedly made clear that those specifics were missing from his statement because he answered only the precise questions that the police interviewer asked of him and did not offer extra details that went beyond the limited scope of each inquiry. For instance, in one exchange, the following colloquy took place between the prosecutor and the defendant:

"Q. And you never told the police that, though, did you?

"A. The police did not ask me detailed questions. It was like giving—the question that the police officer asked me . . . I gave them that answer.

"Q. So, for the first time, you're claiming that Monday night into Tuesday morning you saw your wife at the house?

"A. I'm not claiming [that] for the first time.

"Q. Well, sir, you didn't tell the police on August 9th when they came to your house at 1 o'clock in the morning that your wife had been in the house Monday night, did you?[4]

"A. I have only answered the question [that] the police asked. . . .

"Q. . . . [B]ut you told the police later on in the day on August 9th after they had been to your house that the TV had been smashed on Monday night . . . .

"Q. And when you talked to that officer [at the police station in the evening of August 9], you talked to him—you told him that you were claiming that the TV was damaged Monday night, but you didn't say anything about your wife being home on Monday night, did you? Yes or no?

"A. I didn't—I wasn't—as I said, the only—the only question I answer was [what do] they call it—the question the officer asked me."[5]

Subsequently, during redirect examination, the defendant's written police statement became the subject of questioning once more, this time by defense counsel, and the defendant again testified that the detective did not transcribe the defendant's words in the exact manner as he said them aloud. Thereafter, defense counsel stated that he would like to offer the defendant's police statement as an exhibit, to which the prosecutor objected on the ground that it was self-serving hearsay and not an admission by a party opponent. Defense

counsel responded: "[T]his statement read in its entirety is consistent with his trial testimony. The [state] has in cross-examination picked out inconsistencies, claiming that it's inconsistent with . . . his trial testimony. And that, for the jury to understand whether those are really inconsistencies or not, the jury should have the whole statement in its entirety so they can see exactly how it flows, what he said, what it was about and the context of it . . . ." Defense counsel also asked the court for five minutes to assemble his argument and corresponding case citations, and the court agreed to take a brief afternoon recess.

Upon returning from the court's recess, the prosecutor asserted that our Supreme Court's decisions in *State v. Hines*, 243 Conn. 796, 709 A.2d 522 (1998), and *State v. Jackson*, 257 Conn. 198, 777 A.2d 591 (2001),[6] were inapposite to defense counsel's argument in the present case because *Hines* was overturned,[7] and *Jackson* "points out that the defendant's statement to the police is hearsay and . . . even when he testifies, it doesn't give him the right to introduce otherwise inadmissible hearsay. It doesn't fall within any of the recognized exceptions." The court then sustained the state's objection, stating that "according to *State* v. *Jackson*, [supra, 198] the entire written statement is inadmissible if it's . . . self-serving hearsay. So, I'm going to—since you've already brought out on redirect, [defense counsel], regarding your client's prior consistent statement[s], certainly, they come in, but I'm not going to admit the entire statement."

In an effort to further clarify his argument for the court and for the record, defense counsel then stated: "[A]s I indicated in a note that the [courtroom] clerk delivered to you during a recess, the citations that the clerk wrote were from the Practice Book, including . . . § 1-5 (b) of the [Connecticut] Code of Evidence . . . in order for the jury to understand . . . what the defendant was actually asked about and why he said certain things and didn't say certain things in response to certain questions, and to understand the context of things he did say that went into the statement, the— the entire statement should be admitted so that the jury will have an understanding and be able to better evaluate the credibility of the defendant and his testimony. The statement is consistent with much of his trial testimony, and the purported inconsistencies, when read in the context of the statement, which include the omissions that the state referred to, can't be understood unless this—the jury has the statement before them. That's the—that's the purpose of offering it, Your Honor." In response, the court reiterated that it "made [its] ruling . . . and you've made your record. Thank you."

We begin by setting forth the applicable standard of review and principles of law. "To the extent a trial

court's [ruling regarding] admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court . . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Miller*, 121 Conn. App. 775, 780, 998 A.2d 170, cert. denied, 298 Conn. 902, 3 A.3d 72 (2010). Because the court's interpretation of § 1-5 (b) of the Connecticut Code of Evidence is being challenged, our review is plenary.

"Our cases have long held that, when one party to a litigation or prosecution seeks to introduce admissions that constitute only a portion of a conversation, the opposing party may introduce other relevant portions of the conversation, irrespective of whether they are self-serving or hearsay." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 257 Conn. 213. This principle is codified in § 1-5 (b) of the Connecticut Code of Evidence, which provides: "When a statement is introduced by a party, another party may introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered with it." "The purpose of this rule is to ensure that statements placed in evidence are not taken out of context. . . . This purpose also demarcates the rule's boundaries; a party seeking to introduce selected statements under the rule must show that those statements are, in fact, relevant to, and within the context of, an opponent's offer and, therefore, are part of a single conversation." (Citation omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 213.

Moreover, in *State* v. *Hines*, supra, 243 Conn. 807–808, our Supreme Court held that "[w]hen a party has impeached a witness with portions of a statement that are inconsistent with his or her trial testimony, the trial court may, in its sound discretion, admit the entire statement for rehabilitative purposes, in order to place the allegedly inconsistent statement into context and to prevent the jury from being misled." "[This] precludes selective admission by one party that serves only to distort reality and allow legal technicalities to obfuscate the truth . . . ." (Internal quotation marks omitted.) *State* v. *Efrain M.*, 95 Conn. App. 590, 598, 899 A.2d 50, cert. denied, 279 Conn. 909, 902 A.2d 1069 (2006).

Here, the defendant argues that the court misinterpreted the Connecticut Code of Evidence because the

question of whether a statement is self-serving hearsay is irrelevant to the question of its admissibility under § 1-5 (b). In response, the state argues that the court properly excluded the complete police statement because it "constituted nothing more than a self-serving, prior consistent hearsay statement that had no relevance to offsetting the state's claim of recent contrivance as to certain details and, therefore, was no more admissible than any other out-of-court statement that a party might proffer in an effort to improperly boost a witness' favorable testimony through repetition."

Because the court is vested with the discretion to admit or to bar the statement on fairness grounds only *after* it has made the legal determination that the particular statement is subject to § 1-5 (b) of the Code of Evidence; see *State* v. *Miguel C.*, 305 Conn. 562, 572, 46 A.3d 126 (2012); we begin our analysis by reviewing whether the court's exclusion of the defendant's complete police statement was based on a proper interpretation of § 1-5 (b). As previously discussed, the court was specifically asked to rely on the *Jackson* decision in overruling the state's objection, but ultimately determined that the statement should be excluded because "according to *State* v. *Jackson*, [supra, 257 Conn. 198] the entire written statement is inadmissible if it's . . . self-serving hearsay." In short, there is no reasonable basis from which the court could have concluded that *Jackson* so holds. In fact, *Jackson* expressly stands for the proposition that whether a statement is self-serving hearsay is entirely irrelevant to the question of its admissibility under § 1-5 (b) of the Connecticut Code of Evidence. Id., 213. Moreover, the court's interpretation of § 1-5 (b) utterly fails to take into account that portion of the rule that expressly states that "another party may introduce any other part of the statement, *whether or not otherwise admissible* . . . ." (Emphasis added.) Therefore, we conclude that the court disregarded binding Supreme Court precedent, and failed to construe properly § 1-5 (b) of the Connecticut Code of Evidence, by erroneously ruling that the statement was inadmissible on the ground that it was self-serving hearsay.

Having decided that the court improperly excluded the statement on the basis of an improper interpretation of the Connecticut Code of Evidence, we next turn to whether that error was harmful, such that the defendant is entitled to a new trial. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the . . . case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination oth-

erwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014).

Here, the defendant asserts that the court should have admitted the defendant's complete written statement to the police under § 1-5 (b) because, for two reasons, it would have provided context for the portions of the statement previously introduced by the state: (1) the brevity of the statement might have caused the jury to credit the defendant's testimony as to why his statement to the police was missing certain details to which he testified at trial; and (2) the statement as a whole would have allowed the jury to assess the defendant's credibility without being misled by the prosecutor's paraphrasing of certain portions of the statement, most importantly, her argument that the defendant had "conceded that he signed under oath to that truth that he put a *bar* of soap in [the complainant's] anus . . . ." (Emphasis added.) In addition, the defendant argues that the trial court's improper exclusion of his complete statement to the police was not harmless given the importance of his testimony at trial, the weakness of the state's case against him, and the fact that the jury did not find him guilty of two of the seven counts with which he was charged. It is important to note that the state failed to brief whether such error was harmless and, instead, confined its analysis to whether the full statement was properly excluded.

First, we agree with the defendant that the omission of certain information from his police statement is better understood when viewed in light of the brevity of the police statement as a whole. As previously discussed, the state chose to introduce substantive portions of the defendant's police statement during the defendant's cross-examination. When the state then repeatedly questioned him as to why he left out certain details from the written statement that he later testified to at trial, the defendant made clear that he only answered the narrow questions asked of him by the police interviewer. Although the state argues that the complete statement should not have been admitted because it did not contradict any of the points made by the state during the defendant's cross-examination, this is not the proper standard for considering the defendant's proffer. Rather, a statement should be admitted in its entirety, upon the party declarant's timely request, to "ensure that statements placed in evidence are not

taken out of context." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 257 Conn. 213. The defendant was entitled to have the jury consider that the statement was only approximately one page in length and that about one-half of its substance concerned incidents that occurred solely between the defendant and B.P., in order to better assess the state's assertion that the defendant must be lying on the witness stand regarding certain facts because he never told the police about those facts during his police interview. Without permitting the entire statement to be admitted to show its brevity, the court unduly handcuffed the defendant's ability to argue that he had not disclosed certain details regarding the events in question because the interview questions were limited in scope and duration, as reflected by the shortness of the statement.

Second, we agree with the defendant that the complete police statement was necessary to better explain the state's paraphrasing of a portion of the statement concerning the nature of the bar of soap that was involved in the alleged assault. Specifically, the prosecutor stated during closing argument: "The defendant conceded everything in his statement. He conceded that he signed under oath to that truth that he put a bar of soap in her anus and that he originally told the police officer there was penile/vaginal sex, which he admitted later on was not the truth and which she said was not the truth." During direct examination, however, the defendant testified that he used a small piece of soap[8] to lubricate the complainant's anal area and that the piece accidentally slipped inside of her. Similarly, the language used in the police statement was not "a bar of soap," as the prosecutor characterized it, but a "*used* bar of soap," which is more consistent with the defendant's trial testimony. (Emphasis added.) Permitting the jury to see the actual statement would have allowed it to better assess the defendant's credibility, a critical issue in the present case. Therefore, the complete police statement was necessary "in order to place the allegedly inconsistent statement into context and to prevent the jury from being misled." *State* v. *Hines*, supra, 243 Conn. 808. Accordingly, we conclude that had the court properly applied § 1-5 (b) of the Connecticut Code of Evidence to the facts of the present case, it necessarily would have led to the determination that the defendant should have been permitted to have his complete police statement admitted into evidence to ensure that portions of the statement previously introduced by the state were not taken out of context.

Third, we agree with the defendant that the trial court's improper exclusion of his complete statement to the police was not harmless given the importance of the defendant's witness testimony, the weakness of the state's case against the defendant, and the fact that the jury did not find him guilty of two of the seven counts with which he was charged. Because the defen-

dant conceded that he *did* have a sexual encounter with his spouse on the night in question, but claimed that the encounter was consensual and that her rectal injuries had been caused accidentally, his trial testimony was critical to his defense against the state's charges. Moreover, because of the nature of the defendant's version of events and the fact that the only two witnesses to the alleged assault were the complainant and the defendant, the outcome in this case primarily rested on a credibility contest between the complainant and the defendant, not on any physical evidence presented to the jury. As previously discussed, excluding the defendant's complete statement to the police as a full exhibit unfairly placed the state's selected portions of that statement out of context and likely implicated the defendant's credibility in a negative way. Given the importance to the state's case that the defendant's testimony be found untrustworthy, we cannot conclude that the court's exclusion of the statement did not have a substantial effect on the jury's verdict. This is especially true in light of the fact that the jury did not find the defendant guilty on all of the charges against him, thereby indicating that the jury did not fully credit the testimony of the complainant or fully discredit the testimony of the defendant. The defendant, therefore, is entitled to a new trial.

## II

Our conclusion that a new trial is warranted because the court improperly interpreted § 1-5 of the Connecticut Code of Evidence is dispositive of the defendant's appeal, thus eliminating the need to address most of the defendant's remaining claims. Nevertheless, because the defendant's claim concerning the court's refusal to mark for identification and inspect in camera the complainant's Interval House records is likely to arise again on remand, we also address it in this opinion. See *State* v. *Arroyo*, 284 Conn. 597, 601 n.3, 935 A.2d 975 (2007).

The claim is twofold: first, the defendant claims that the court improperly refused to mark for identification the complainant's privileged Interval House records; and second, he claims that the court improperly refused to conduct an in camera review of the Interval House records after he made the requisite threshold showing for the review.[9] In response, the state argues that although the court's refusal to mark the documents for identification was improper, the defendant did not make an adequate showing that an in camera review of the privileged Interval House records was warranted. We agree with both parties that the refusal to mark the records for identification was improper, and agree with the defendant that an adequate showing for an in camera review of the records was made.

The following additional facts and procedural history are relevant to these claims. When the complainant told

her doctor during her August 7, 2012 appointment that the defendant was responsible for her injuries, the doctor recommended that she speak with someone from Interval House. Before the start of trial, the complainant's records from Interval House were subpoenaed, and the organization complied with the subpoena by providing those records, under seal, to the court clerk. Thereafter, during trial, the doctor testified that the complainant did, in fact, speak to an individual from Interval House over the telephone. The doctor testified: "[A]nyone who I am concerned might be in a domestic violence relationship or the victim of a domestic violence act, it's my practice to get that individual on the phone with a counselor at the time of the office visit." The complainant also testified that she spoke with an individual from Interval House, whom she categorized as being "a sexual abuse counselor," when she was at the doctor's office on August 7, 2012.

Because the Interval House records are privileged as communications between a victim and a battered woman's or sexual assault counselor; see General Statutes § 52-146k; the defendant requested during a pretrial motion hearing on December 5, 2014, that the court review the records in camera for exculpatory information that could be used to impeach the complainant. Specifically, the defendant made the following offer of proof: "[I]nitially, [the complainant] told the doctor, as evidenced in these medical reports, only one thing [about the alleged assault], that the defendant penetrated her rectum with his fingers and twisted hard. . . . No evidence—no indication here whatsoever of penile penetration or attempted anal sex. There [are] four counts here of attempted or committed anal intercourse, at least two of them deal with penile penetration. . . . The allegation, Your Honor, at her deposition and in the police reports, is that he penetrated her with his penis and with soap on two occasions, at least, in the bathroom and then again on the bed . . . ."

The defendant then argued that the Interval House records would likely indicate whether the complainant told the Interval House employee the same version of events that she told the doctor, i.e., the one containing no reference to the alleged penile and soap penetration or to the physical nonsexual assault, or the same version of events she told the police, i.e., the one containing those additional allegations. Accordingly, the defendant contended, the court should review the documents in camera before the start of the trial to determine whether the statement the complainant made to Interval House necessarily conflicted either with her statement to her doctor or with her statement to the police and, thus, is exculpatory because it could be used to impeach her trial testimony. The defendant argued that he needed any impeachment material likely to be found in the Interval House records to prepare for the trial and for the complainant's cross-examination.

The court ruled that the defendant did not make the threshold showing for an in camera review, but informed him that if he raised the issue on cross-examination of the complainant, and if "there's something in there which may indicate that [the complainant] may have said something different to the Interval House that may be impeachment material, then . . . I'll look at the Interval House records in camera at that time. But right now, you haven't shown me anything that would indicate that there's something in there. You're just guessing right now." Accordingly, the court denied the motion without prejudice. When the defendant later renewed his motion to review the records after the complainant's cross-examination, the court again denied the motion, stating that the defendant "still [had] not made a threshold showing that there's anything in there other than your conjecture."

Subsequently, before the start of the fourth day of trial, the defendant requested that the court mark for identification the complainant's Interval House records, but the court declined to do so "because [it] never looked at them." When the defendant pointed out that that is the exact reason why they need to be marked for appellate review, the court replied: "No, I don't believe so . . . . I believe once I look at them and if I determine that there's nothing in there that's impeachment material, then they need to be marked and sealed for the Appellate Court. But I could be wrong; I don't know." The defendant asked the court to reconsider on the basis of case law, although he could not cite an applicable case at that time, and again explained that the defendant was entitled to have the records be preserved for appellate review. The court then stated: "Give me the case cite, and I'll look at it, but for now it's not going to be marked."

Thereafter, before the start of the defendant's sentencing hearing on February 26, 2015, the defendant highlighted for the court specific parts of his motion for a new trial, dated December 24, 2014, and stated: "[P]aragraph eight deals with the issue of whether or not the court should mark for identification and seal for appellate review the Interval House records. Even though they were not reviewed by the court in camera, Your Honor, I believe the case law is that the court has the obligation to do so to preserve for appellate review in the event that an appellate court thinks that the— or rules that the court should have conducted an in camera review so that there can be a record for further review. So, that was one new citation. At the time of trial, the court asked me if I had any case law on the obligation to seal it, and at that time, I didn't. Although I thought that it was an obligation, I couldn't recite that for the court and never brought this case to the court's attention during trial, and I apologize for that, but I thought at the time of the motion for [a] new trial, this

might be a time for the court to mark these records for purposes of preserving the record for appeal. So, I'd ask the court to do that based on *State* v. *Bruno* [236 Conn. 514, 673 A.2d 1117 (1996)]."

In response, the court stated: "The court has had the opportunity to review the case, *State* v. *Bruno*, [supra, 236 Conn. 514] cited by the defendant in [his] motion to—for a new trial. The facts in *Bruno* are distinguishable from our current case, mostly because the documents that were requested in *Bruno* were psychiatric records, which the . . . trial court found that the defendant had failed to make a threshold showing that there was anything in there that would be probative. So, in that case, the court denied the in camera review and did not mark the psychiatric records, which the Appellate Court did find that was an error, but it was a harmless error. In our case, those aren't psychiatric records. These are records that are protected by statute, the Interval House records." On that basis, the court again declined to mark the records for identification.

A

We first turn to whether the court improperly refused to mark the Interval House records for identification. We agree with both the state and the defendant that this was improper.

Although evidentiary matters typically fall within the court's discretion, "[t]he right to have a proffered exhibit marked for identification is indeed a broad one." *State* v. *Onofrio*, 179 Conn. 23, 34, 425 A.2d 560 (1979). "A trial court has the absolute duty to mark for identification and seal for possible appellate review any such records offered, whether or not an in camera inspection is undertaken, even in the absence of an objection to its failure to do so from the parties." *State* v. *Bruno*, supra, 236 Conn. 538. "A trial court's refusal to permit documents to be marked as exhibits for identification is 'manifest error.'" *State* v. *Onofrio*, supra, 43.

In the case at hand, the state concedes that the court's refusal to mark the Interval House records for identification was error. We agree. Although the court attempted to distinguish *Bruno*, we can divine no practical difference between psychiatric records, and records of communications between a victim and a battered woman's or sexual assault counselor, both of which are protected by statute. See General Statutes § 52-146d (privileged communications between psychiatrist and patient); General Statutes § 52-146k (privileged communications between victim and domestic violence counselor or sexual assault counselor). Thus, for the second time in this case, the court was presented with binding case law on an evidentiary issue and proceeded to disregard it. The court's impropriety was " 'manifest error.' " *State* v. *Onofrio*, supra, 179 Conn. 43.

B

We turn next to the defendant's claim that the court improperly refused to inspect in camera the Interval House records despite the fact that he had made a sufficient preliminary showing required for such inspection. We agree with the defendant.

"[I]n camera judicial review of a victim's privileged records currently represents the most common method of balancing statutory privileges against the defendant's trial rights." (Internal quotation marks omitted.) *State* v. *Slimskey*, 257 Conn. 842, 856 n.9, 779 A.2d 723 (2001). "It is well settled in this state that before a criminal defendant may obtain an in camera inspection of a witness' confidential records for purposes of impeachment, he or she must first demonstrate that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. *State* v. *Esposito*, [supra, 192 Conn. 179] . . . . Our assessment of the trial court's decision to restrict the defendant's access to the witness' confidential records must, however, take into account the recognized principle that such a restriction implicates the defendant's constitutional right to impeach and discredit state's witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 557, 747 A.2d 487 (2000). Thus, "[u]pon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences." (Internal quotation marks omitted.) *State* v. *Howard*, 221 Conn. 447, 457–58, 604 A.2d 1294 (1992).

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in [*Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness." (Internal quotation marks omitted.) *State* v. *Esposito*, 235 Conn. 802, 815–16, 670 A.2d 301 (1996). Our Supreme Court has held that "[i]nconsistencies may be shown not only by contradictory statements but also by omissions." *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Therefore, "[i]f a former statement fails to mention a material fact presently testified to, which it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent." (Internal quotation marks omitted.) *State* v. *Reed*, 174 Conn. 287, 303, 386 A.2d 243 (1978).

To meet his or her threshold burden for obtaining in camera review of privileged records, "the defendant must do more than assert that the privileged records

may contain information that would be useful for the purposes of impeaching a witness' credibility." *State* v. *McClelland*, 113 Conn. App. 142, 160, 965 A.2d 586, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009). "The defendant's offer of proof should be specific and should set forth the issue in the case to which the [confidential] information sought will relate." (Internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 599, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). At the same time, however, "[o]ur Supreme Court has urged trial courts to permit the defendant a certain latitude in his [or her] attempt to make [the preliminary showing required to obtain an in camera inspection of confidential records] . . . ." (Internal quotation marks omitted.) *State* v. *Rosado*, 52 Conn. App. 408, 418, 726 A.2d 1177 (1999).

In the present case, we conclude that the defendant satisfied the threshold requirement for an in camera inspection of the complainant's Interval House records. Rather than merely asserting a general belief that the privileged records might contain impeachment information to be used against the complainant during cross-examination, the defendant's offer of proof here was well-defined and sufficiently set forth the issue in the case to which the information sought would relate. As a preliminary matter, we note that the defendant asserted to the court that, without knowing precisely what the complainant told Interval House, the evidence led to the conclusion that she provided some sort of backstory concerning the alleged assault to the Interval House individual. We, too, are persuaded that it is not unreasonable to infer from the existence of the complainant's subpoenaed Interval House records that the complainant would have been asked by Interval House to explain why she was calling and, thus, would have provided a statement about the events that gave rise to her referral to the organization. Accordingly, we now turn to the crux of the defendant's offer of proof.

Specifically, the defendant argued that the complainant's version of events concerning the alleged assault that she told her doctor was inconsistent from the version of events that she later told the police, because the former statement omitted material facts that would have been natural to mention to the health care provider. For example, the defendant cited for the court how the complainant told her doctor that the defendant forcefully put his fingers in her anus during the alleged assault, but did not say that the defendant struck her in the chest or that he forcefully inserted his penis and a bar of soap into her anus.[10] Because these two statements were inconsistent with each other, the defendant argued, it was reasonable to infer that a third statement to Interval House must necessarily conflict with at least one of them and, thus, would be exculpatory in nature because it serves as impeachment evidence for the trial testimony of the complainant, the

state's key witness in the case.

Ultimately, the defendant's offer of proof here was not a mere attempt "to conduct a general fishing expedition into a witness' privileged records." (Internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 856 n.9. Rather, the defendant laid a sufficient foundation to indicate a " 'reasonable ground to believe' "; *State* v. *Ortiz*, supra, 252 Conn. 557; that the Interval House records contained material useful for impeachment of a crucial prosecution witness, the complainant, whose credibility was a critical factor to obtain a conviction. We conclude, therefore, that the court improperly ruled that the defendant had not made a sufficient showing to compel an in camera inspection of the records.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

\* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the complainant or others through whom her identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant also makes the following additional claims on appeal: the prosecutor violated his due process rights by referring to statements not in evidence during cross-examination and closing argument; the court improperly refused to conduct an in camera review of confidential records from the court support services division of the Judicial Branch; and the court improperly admitted evidence, as prior uncharged misconduct, of two photographs of the complainant depicting prior injuries allegedly caused by the defendant.

[2] Generally speaking, if we reverse a judgment and remand the case for a new trial, we sometimes choose to review other claims that are likely to arise on retrial. See, e.g., *State* v. *T.R.D.*, 286 Conn. 191, 195, 942 A.2d 1000 (2008). Because the Interval House records may well contain a statement by the complainant regarding the alleged assault with which the defendant was charged, the claims regarding these specific records are likely to arise again on retrial. Because the remaining evidentiary claims raised by the defendant on appeal are more tangential to the ultimate issue in the present case, however; see footnote 1 of this opinion; we are not persuaded that they are necessarily likely to arise again on retrial, and, therefore, we decline to address them.

[3] The defendant was acquitted on count five, which charged him with attempt to commit sexual assault in a spousal relationship for allegedly trying to compel his spouse to perform oral sex on him, and acquitted on count three, which was one of the counts that charged him with sexual assault in a spousal relationship for allegedly penetrating his spouse's anus with his penis. In its brief, the state misidentifies conduct of which the defendant was found not guilty. Additionally, in its "counterstatement of the facts," the state sets forth the conduct forming the basis for count five, on which the defendant was acquitted, and does not set forth the conduct forming the basis for count four, on which the defendant was convicted.

[4] The complainant had testified that on Monday, she had spent the night with a friend so as to avoid the defendant. The defendant, in an attempt to demonstrate that she was being untruthful and instead was still sleeping in the same house with him, testified that he saw her in the house on "Monday night [into] Tuesday morning . . . ."

[5] In another similar exchange during cross-examination, after the prosecutor pointed out that the defendant failed to tell the police that B.P. had hit the complainant when she intervened in the dispute between the defendant and B.P. on the evening in question, the defendant repeatedly responded that he "only [answered] the question [that] the police asked" and, for this reason, "didn't tell a lot of things to the police" during his interview.

[6] Although the record is not entirely clear, it appears that these cases had been mentioned in some capacity by the parties and the trial judge during the court's recess, such that each was aware that the cases might be part

of the discussion when court was called back in session.

[7] The state's assertion was incorrect. Although one portion of *Hines*, not relevant to this issue, had been criticized by our Supreme Court in a subsequent case; see *State* v. *Sawyer*, 279 Conn. 331, 353, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 454–55 n.23, 953 A.2d 45 (2008); the holding in *Hines* on this question remains good law and has been cited repeatedly by our appellate courts. See, e.g., *State* v. *Burney*, 288 Conn. 548, 559–60, 954 A.2d 793 (2008); *State* v. *Gauthier*, 140 Conn. App. 69, 78–79, 57 A.3d 849, cert. denied, 308 Conn. 907, 61 A.3d 1097 (2013); *State* v. *Arcia*, 111 Conn. App. 374, 382–83, 385, 958 A.2d 1253 (2008), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009).

[8] On this point, the following exchange took place between defense counsel and the defendant during direct examination:

"Q. . . . [D]escribe the size of the piece [of soap] that you took out . . . .

"A. About the size of my finger.

"Q. Okay. I want to show you the top of this pen, this magic marker, and ask you, was it the piece that you took out [of] the dish?

"A. Something—yeah. We keep those inside. Yes.

"Q. Okay. So, it was about the size of the top of the magic marker I'm holding in my hand . . . .

"A. Yes."

[9] In his brief, the defendant organizes his analysis of this claim by first asserting that the court improperly refused to mark for identification the Interval House records, and then, as part of his contention that this error was harmful, by arguing that the court also improperly concluded that he failed to make a sufficient showing, pursuant to *State* v. *Esposito*, supra, 192 Conn. 179–80, that he was entitled to have the records reviewed in camera. For the reasons that we discuss, we conclude that the court improperly failed to mark the records for identification. We also conclude that it is likely that the issue of whether the defendant is entitled to an in camera review of the records will arise on retrial. We thus choose to address that claim here because both the state and the defendant have fully briefed and argued it, and the state has not asserted that the defendant failed to independently raise it as a claim on appeal.

[10] The defendant also explained the importance of these inconsistencies to the court by noting that at least three of the counts with which he was charged were based on penile penetration, conduct that was never mentioned to the doctor.

---